[NOT YET SCHEDULED FOR ORAL ARGUMENT]

# No. 22-1308

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

––––––––––––––––

### JOHANNES LAMPRECHT AND LINDA LAMPRECHT,

Petitioners-Appellants

v.

### COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee

––––––––––––––––

## ON APPEAL FROM THE DECISION OF
## THE UNITED STATES TAX COURT

––––––––––––––––

## BRIEF FOR THE APPELLEE

––––––––––––––––

DAVID A. HUBBERT
*Deputy Assistant Attorney General*

ARTHUR T. CATTERALL              (202) 514-2937
ROBERT J. BRANMAN               (202) 307-6538
*Attorneys*
*Tax Division*
*Department of Justice*
*Post Office Box 502*
*Washington, D.C. 20044*

15256057.1

-i-

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties and Amici**.  The parties, intervenors, and amici appearing in the Tax Court and in this Court are petitioners Johannes Lamprecht and Linda Lamprecht and respondent Commissioner of Internal Revenue.  There were no amici or intervenors appearing before the Tax Court, and there are no amici or intervenors who have appeared in this Court.

**B.    Rulings Under Review**.  The rulings under review are the Tax Court's memorandum opinion dated August 31, 2022, and its decision dated September 6, 2022, both issued by Judge Gustafson.  The memorandum opinion is available at the Tax Court's website as T.C. Memo. 2022-91 and on Westlaw at 2022 WL 3923833.

**C.    Related Cases**.  This case was not previously before this Court or any other appellate court.  Counsel is unaware of any related cases pending in this Court or in any other court, as provided in Cir. R. 28(a)(1)(C).

15256057.1

# TABLE OF CONTENTS

**Page**

Certificate as to parties, rulings, and related cases ...................................i
Table of contents...........................................................................................ii
Table of authorities ......................................................................................v
Glossary ..........................................................................................................x
Statement of jurisdiction..............................................................................1
Statement of the issues ................................................................................2
Statutes and regulations ..............................................................................3
Statement of the case ...................................................................................3

     A.    Taxpayers' citizenship, residence, and income sources ...............................................................................3

     B.    Interests in foreign entities ...........................................4

     C.    Original returns ...............................................................5

     D.    The United States serves a summons on UBS.............6

     E.    Amended returns .............................................................8

     F.    Examination .....................................................................9

     G.    Notice of deficiency and Tax Court proceedings..........11

Summary of argument ................................................................................12
Argument ......................................................................................................16

     The Tax Court correctly sustained the IRS's assertion of accuracy-related penalties against taxpayers................................16

          Standard of review ...............................................................16

          A.    Introduction..............................................................17

15256057.1

**Page**

B.  The Commissioner demonstrated that the initial determinations to assess penalties were personally approved in writing by the revenue agent's immediate supervisors ................................. 19

    1.  The Forms 5345-D reflect that the Revenue Agent made the initial determinations to assess penalties .................................... 21

    2.  The initial determinations were properly approved ............................................................. 25

    3.  Taxpayers did not establish that the Forms 5345-D should be excluded as a discovery sanction ............................................................. 26

    4.  The Commissioner established supervisory approval of the initial determination to assess a penalty for negligence or disregard of rules or regulations ......................................... 31

    5.  There are divergent views in the Federal Courts about when the penalty must be approved ............................................................. 32

C.  Taxpayers' amended returns were not "qualified amended returns" — and therefore did not preclude the applicability of penalties — because they were filed after the IRS served the John Doe summons on UBS ......................................... 34

    1.  The text of the regulation and example 5 demonstrate that omission of gross income is a claim of a tax benefit ....................................... 35

**Page**

2.   Caselaw supports a broad
     interpretation of Treas. Reg. § 1.6664-
     2(c)(3)(i)(D) ................................................. 39

3.   In any event, taxpayers affirmatively
     claimed a tax benefit from the omitted
     income on their initial returns by
     claiming itemized deductions that
     otherwise would have been reduced .......... 42

D.   The notice of deficiency was timely because the
     issuance of the John Doe summons suspended the
     limitations period for a sufficient period of time by
     operation of I.R.C. § 7609(e) ........................................ 43

     1.   The statute of limitations was suspended
          for a sufficient period of time under I.R.C.
          § 7609(e) ............................................................ 46

          a.   The John Doe summons was valid ............ 48

          b.   The summons reached its final
               resolution when it was withdrawn on
               November 15, 2010 .................................... 53

     2.   Alternatively, the notice of deficiency was
          timely because Johannes Lamprecht failed to
          provide required information for the foreign
          corporation that he controlled, thereby
          implicating a special limitations provision ........ 59

          a.   Johannes Lamprecht controlled Paro ........ 60

          b.   Paro is a foreign corporation ..................... 60

Conclusion ................................................................................ 64
Certificate of compliance ........................................................ 65
Addendum ................................................................................ 66

-v-

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Belair Woods, LLC v. Commissioner*,
   154 T.C. 1 (2020) ............................................................................ 33
*Campbell v. Commissioner*,
   119 T.C.M. (CCH) 1266,
   2020 WL 1686382 (T.C. 2020) ..................................................... 24
*Chai v. Commissioner*,
   851 F.3d 190 (2d Cir. 2017) ......................................................... 18
*Colliot v. United States*,
   No. 1:19-CV-212-LY,
   2021 WL 2709676 (W.D. Tex. Mar. 24, 2021) ........................ 59-60
*Colony, Inc. v. Commissioner*,
   357 U.S. 28 (1958) ................................................................... 40-41
*Cook v. Tait*,
   265 U.S. 47 (1924) ........................................................................ 38
*Matter of Does*,
   688 F.2d 144 (2d Cir. 1982) ......................................................... 51
*Flume v. Commissioner*,
   113 T.C.M. (CCH) 1097,
   2017 WL 394541 (T.C. 2017) ....................................................... 59
*U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*,
   764 F.3d 19 (D.C. Cir. 2014) ....................................................... 27
*Higbee v. Commissioner*,
   116 T.C. 438 (2001) ...................................................................... 18
*Kroner v. Commissioner*,
   48 F.4th 1272 (11th Cir. 2022) ..................................................... 33
*Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*,
   29 F.4th 1066 (9th Cir. 2022) ....................................................... 33
*McCarthy v. Commissioner*,
   119 T.C.M. (CCH) 1514,
   2020 WL 2919522 (T.C. 2020) ................................................. 24-25
*Minemyer v. Commissioner*,
   No. 21-9006, 2023 WL 314832
   (10th Cir. Jan. 19, 2023) .............................................................. 33

**Cases (continued):**                                           **Page(s)**

*Palmolive Bldg. Invs., LLC v. Commissioner,*
152 T.C. 75 (2019)......................................................24-26

*Pardo-Kronemann v. Donovan,*
601 F.3d 599 (D.C. Cir. 2010)........................................ 16

*Queen v. Schultz,*
747 F.3d 879 (D.C. Cir. 2014)........................................ 45

*Rogers v. Commissioner,*
783 F.3d 320 (D.C. Cir. 2015)........................................ 38

*Rost v. United States,*
44 F.4th 294 (5th Cir. 2022)........................................ 5, 62

*Ruidoso Racing Ass'n, Inc. v. Commissioner,*
476 F.2d 502 (10th Cir. 1973) .....................................39-40

*Ryskamp v. Commissioner,*
797 F.3d 1142 (D.C. Cir. 2015) ..................................... 16

*Selden v. Airbnb, Inc.,*
4 F.4th 148 (D.C. Cir. 2021)........................................ 23

*United States v. Ernst & Whinney,*
750 F.2d 516 (6th Cir. 1984) ........................................ 51

*United States v. Home Concrete & Supply, LLC,*
566 U.S. 478 (2012) .................................................40-41

*United States v. Meador,*
138 F.3d 986 (5th Cir. 1998) ........................................ 57

*United States v. Powell,*
379 U.S. 48 (1964) .................................................49-50, 52

*United States v. Samuels, Kramer & Co.,*
712 F.2d 1342 (9th Cir. 1983) ....................................... 51

**Statutes:**

18 U.S.C. § 3292 ...................................................... 57

Internal Revenue Code (26 U.S.C.):
§ 61(a)(3) ........................................................... 41
§ 68 .................................................................42-43
§ 318 ................................................................. 60
§ 911 ................................................................. 38

**Statutes (continued):** **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont'd):

§ 911(a)(1) ................................................................. 38
§ 911(b)(2) ................................................................. 38
§ 911(d)(1) ................................................................. 38
§ 1001(a) .................................................................... 41
§ 6038 ........................................................................ 62
§ 6038(a) .................................................................... 59
§ 6038(e)(2) ............................................................... 60
§ 6048(a) .................................................................... 63
§ 6048(b)(1) ............................................................... 63
§ 6051(c)(8) ............................................................... 62
§ 6201 ........................................................................ 22
§ 6213(a) ...................................................................... 2
§ 6214 .......................................................................... 2
§ 6501 ........................................................................ 44
§ 6501(c)(1) ........................................................... 44-45
§ 6501(c)(8) ............................................ 16, 44-45, 59, 62-64
§ 6501(e)(1)(A) .......................................................... 44
§ 6501(e)(1)(B)(ii) ...................................................... 42
§ 6503 ........................................................................ 44
§ 6662 ........................................... 2-3, 10, 12-13, 24-25, 64
§ 6662(a) ............................................................... 17, 32
§ 6662(d)(1)(A) ....................................................... 12, 17
§ 6662(d)(2)(B)(ii) ...................................................... 39
§ 6663 ........................................................................ 11
§ 6665(a) ..................................................................... 
§ 6751(b) ................................. 2, 11-12, 18, 20, 24, 29-31
§ 6751(b)(1) ............................... 12, 18-19, 22, 24, 29
§ 7442 .......................................................................... 2
§ 7482(a) ...................................................................... 2
§ 7483 .......................................................................... 2
§ 7491(c) .................................................................... 18
§ 7609(e) .............................. 12, 14-15, 43-46, 49-50, 53
§ 7609(f) ........................................... 6, 34, 48, 50-51
§ 7701(a)(30)(A) ...................................................... 60

## Statutes (continued):                                              Page(s)

Calif. Family Code § 770(a)(2) ............................................................ 61

International Business Company Act of 1984 ..................................... 4

Virgin Islands Business Company Act ............................................... 4

## Rules and Regulations:

Fed. R. Civ. P. Rule 56(d) ................................................................. 30

T.D. 9186, 2005-1 C.B. 790, 70 Fed. Reg.
    10037-02 (Mar. 2, 2005) .............................................................. 37

Tax Court Rule:
    121(e) .......................................................................................... 30
    142(a) .......................................................................................... 18

Treasury Regulation (26 C.F.R.):
    § 1.1-1(b) ..................................................................................... 38
    § 1.911-7(a)(1) ............................................................................ 38
    § 1.6038-2(a), (i) .................................................................. 16, 59
    § 1.6038-2(d) .............................................................................. 60
    § 1.6662-2(c) ........................................................................ 10, 17
    § 1.6664-2(c)(2)-(3) .................................................................... 34
    § 1.6664-2(c)(3) .................................................................... 13, 43
    § 1.6664-2(c)(3)(i)(D) ........................................................... 36, 39
    § 1.6664-2(c)(3)(i)(D)(*1*) ................................... 34-36, 41-42
    § 1.6664-2(c)(5) .......................................................................... 36
    § 16.3-1(a) (2005) ....................................................................... 63
    § 301.7609-5(d) ........................................................................... 46
    § 301.7609-5(e)(3) .......................................................... 46-47, 53, 58
    § 301.7701-2(a) ........................................................................... 61

15256057.1

**Miscellaneous:**                                               **Page(s)**

Form 2555, "Foreign Earned Income." ................................................ 38

Form 3520, "Annual Return To Report Transactions With
    Foreign Trusts and Receipt of Certain Foreign Gifts" ................ 62

Form 5471, "Information Return of U.S. Persons With
    Respect to Certain Foreign Corporations," ........................... 44, 59

Rev. Proc. 2002-69, 2002-2 C.B. 831. ........................................... 60-62

-x-

# GLOSSARY

| Term | Definition |
|------|------------|
| Code or I.R.C. | Internal Revenue Code (26 U.S.C.) |
| Commissioner | Commissioner of Internal Revenue |
| IRS | Internal Revenue Service |
| SFTA | Swiss Federal Tax Authority |
| UBS | A Swiss bank, formerly known as the Union Bank of Switzerland.  The bank is now known simply as "UBS," which is not an acronym, or as "UBS, AG." |

**[NOT YET SCHEDULED FOR ORAL ARGUMENT]**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

**No. 22-1308**

**JOHANNES LAMPRECHT AND LINDA LAMPRECHT,**

**Petitioners-Appellants**

**v.**

**COMMISSIONER OF INTERNAL REVENUE,**

**Respondent-Appellee**

———————————

**ON APPEAL FROM THE DECISION OF
THE UNITED STATES TAX COURT**

———————————

**BRIEF FOR THE APPELLEE**

———————————

**STATEMENT OF JURISDICTION**

On January 9, 2015, the IRS issued a notice of deficiency to

Johannes and Linda Lamprecht ("taxpayers"), addressed to them in

Switzerland, for their tax years 2006 and 2007.  (A. 764.)[1]  Taxpayers

timely petitioned the Tax Court for a redetermination of the deficiencies

———————————

[1] "A." references are to the separately bound record appendix.
"SA." references are to the Commissioner's supplemental appendix.

15256057.1

on June 5, 2015.  (A. 40.)  The petition was timely because a taxpayer

has 150 days from the issuance of the notice of deficiency in which to

petition for a redetermination if the notice was sent to an address

outside the United States.  *See* I.R.C. (26 U.S.C.) § 6213(a).  The Tax

Court had jurisdiction over the petition under I.R.C. §§ 6213(a), 6214,

and 7442.

The Tax Court entered a final decision resolving all claims of all

parties on September 6, 2022.  (A. 1413.)  Taxpayers filed a timely

notice of appeal on December 2, 2022, within 90 days after the entry of

the decision.  (A. 1416.)  *See* I.R.C. § 7483.  This Court has jurisdiction

under I.R.C. § 7482(a).

## STATEMENT OF THE ISSUES

1.     Whether the Tax Court correctly held that the Commissioner

satisfied his burden to show that the initial determinations to assess

accuracy-related penalties (I.R.C. § 6662) against taxpayers were

properly approved in compliance with I.R.C. § 6751(b).

2.     Whether the Tax Court correctly held that amended 2006

and 2007 returns taxpayers filed in 2010 were not "qualified amended

-3-

returns" and therefore did not preclude the applicability of penalties under I.R.C. § 6662.

3.    Whether the Tax Court correctly held that the statutes of limitations for 2006 and 2007 were still open when the IRS issued its notice of deficiency to taxpayers.

## STATUTES AND REGULATIONS

All applicable statutes and regulations are set forth in an addendum at the end of this brief.

## STATEMENT OF THE CASE

After comparing taxpayers' original and amended returns for both 2006 and 2007, the IRS determined that taxpayers were liable for a penalty for each year under I.R.C. § 6662 for substantial understatement of income tax, and it issued a notice of deficiency reflecting that determination.  Taxpayers petitioned the Tax Court for a redetermination, and both parties moved for summary judgment.  The Tax Court granted the Commissioner's motion, denied taxpayers' motion, and entered a decision sustaining the penalties.  (A. 1412-13.)

### A.    Taxpayers' citizenship, residence, and income sources

Taxpayers are citizens of Switzerland.  (A. 608.)  In 2006 and 2007 they resided in Tiburon, California, and held visas entitling them to

15256057.1

lawful permanent residence in the United States.  (A. 75, 102, 608, 615, 647.)  Johannes Lamprecht surrendered his permanent residence visa in 2009 and returned to Switzerland, and Linda Lamprecht did the same the next year.  (A. 608.)

In 2006 and 2007 Johannes Lamprecht earned commissions from the Swiss bank UBS for business referrals, which UBS deposited into one of his UBS accounts in Switzerland. (A. 940-41.)  He also realized foreign-source income in the form of interest, dividends, and capital gains.  (A. 1383 & n.5.)

## B.    Interests in foreign entities

Johannes Lamprecht owned a controlling interest in Paro, Inc., an entity incorporated under the laws of the British Virgin Islands in 1985 as a limited liability company under the International Business Company Act of 1984.  (A. 811.)  Paro was reregistered on January 1, 2007, as a limited liability company under the British Virgin Islands Business Company Act.  (*Id*.)  In 2006 and 2007 Mr. Lamprecht was a beneficial owner of an account maintained by Paro at UBS.  (A. 820, 823.)  Taxpayers did not file Form 5471 ("Information Return of U.S.

15256057.1

-5-

Persons With Respect to Certain Foreign Corporations") with respect to Paro, Inc., for either 2006 or 2007.  (A. 106.)

During 2006 and 2007 taxpayers also had an interest in a Liechtenstein stiftung called Ilara Familienstiftung ("Ilara").[2]  (A. 507.) The Commissioner contends that Ilara is classified as a foreign trust under U.S. tax law.  (A. 84.)  Taxpayers did not file Form 3520 ("Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts") or Form 3520-A ("Annual Information Return of Foreign Trust With a U.S. Owner") with respect to Ilara for either 2006 or 2007.  (A. 102.)

## C.    Original returns

Taxpayers timely filed their original 2006 and 2007 federal income tax returns.  (A. 752, 756.)  Taxpayers did not report the UBS commissions on those returns, nor did they report their foreign-source interest, dividends, and capital gains.  (A. 1383.)  Taxpayers also answered "no" to a question on Schedule B of each return regarding whether they held any foreign accounts.  (A. 618, ln. 7a, 650, ln. 7a.)  In

---

[2] "Stiftung" is a German word for a "foundation."  *Rost v. United States*, 44 F.4th 294, 297 (5th Cir. 2022).

-6-

fact, taxpayers held bank accounts in Switzerland during both years.

(A. 684, ln. 7, 722, ln. 7.)

## D.    The United States serves a summons on UBS

The Department of Justice petitioned a district court for leave to

serve a summons under I.R.C. § 7609(f), commonly known as a "John

Doe" summons, on UBS to gather information regarding United States

taxpayers with UBS accounts.[3]  The IRS may serve a John Doe

summons only after an *ex parte* hearing in a district court in which the

IRS makes a required showing.  The district court found that the

proposed summons satisfied the requirements of I.R.C. § 7609(f) and

authorized the IRS to serve the summons.  (A. 784-85.)  The IRS served

---

[3] The summons sought information on the following class of
persons (A. 787):

> United States taxpayers, who at any time during the years
> ended December 31, 2002 through December 31, 2007, had
> signature or other authority ... with respect to any financial
> accounts maintained at, monitored by, or managed through
> any office in Switzerland of UBS AG or its subsidiaries or
> affiliates and for whom UBS AG or its subsidiaries or
> affiliates (1) did not have in its possession Forms W–9
> executed by such United States taxpayers, and (2) had not
> filed timely and accurate Forms 1099 naming such United
> States taxpayers and reporting to United States taxing
> authorities all reportable payments made to such United
> States taxpayers.

the summons on UBS on July 21, 2008. (A. 787-88.) The summons requested records regarding: (1) the identities of U.S. taxpayers in the specified class; (2) foreign entities established or operated on behalf of each U.S. taxpayer; (3) relationship managers for each U.S. taxpayer; (4) the opening of financial accounts, and periodic statements and records reflecting account activity; and (5) the referrals of each U.S. taxpayer to UBS offices in Switzerland. (A. 789-92.) The summons required UBS to appear before the IRS in Miami, Florida on August 8, 2008, to testify and produce records. (A. 787.)

UBS did not appear at the time and place required and did not fully comply with the summons. (A. 1061.) On February 19, 2009, the United States petitioned a district court to enforce the summons. (A. 794.) The Government of Switzerland appeared and participated as amicus. (A. 796.) The suit was ultimately resolved through two agreements that were both executed August 19, 2009. One agreement, between the United States and Switzerland, established a mechanism for exchanging information between the U.S. and Swiss tax authorities pursuant to the tax treaty between the countries. (A. 921.) The second agreement, between the United States and UBS, established a process

-8-

for resolving the summons. That agreement provided in pertinent part that (1) the United States would request the documents from the Swiss Federal Tax Authority (SFTA), and UBS would produce the requested documents to the SFTA on a rolling basis, (2) the United States would dismiss the summons enforcement action, but the dismissal would not affect the enforceability of the summons, and (3) the IRS would withdraw the summons with prejudice only after receiving the information requested from UBS. (A. 921-26.) The case was dismissed pursuant to the parties' stipulation on August 19, 2009. (A. 807, 934.) The IRS formally withdrew the summons by letter dated November 15, 2010. (A. 809.) The information that UBS produced under the summons included information about the Lamprechts. (A. 1386.)

### E.    Amended returns

In December 2010 taxpayers filed amended returns for 2006 and 2007. (A. 752, 756.) The amended returns revealed that taxpayers had omitted from the original returns about $1.7 million of 2006 income and $5 million of 2007 income. (A. 678, ln. 1, 716, ln. 1.) This resulted in a $621,471 increase in tax for 2006 and a $1,882,243 increase in tax for 2007. (A. 678, 716.) Taxpayers stated on both amended returns that

they held foreign accounts and identified Switzerland as the country where the accounts were located.  (A. 684, 722.)  Taxpayers paid the additional tax (plus interest) when they filed the amended returns.  (A. 752, 756.)

### F.    Examination

The IRS subsequently examined taxpayers' return for 2010. During the examination the revenue agent assigned to the matter, Norbert Nyereyemhuka ("RA Nyereyemhuka"), reviewed the amended returns for 2006 and 2007.  On February 12, 2014, he submitted to his immediate supervisor, Robert Davis, a Form 5345-D, "Examination Request-ERCS (Examination Returns Control System) Users," requesting that the 2007 return be opened for examination.  The form stated that the reason for the request was "[t]o open up 2007 tax year to assess penalties on amended return that does not meet the qualified amended tax returns criteria."  The form also states, under "Follow-Up Actions," "Open up tax year / Assess accuracy penalty."  Mr. Davis approved the request by signing the form on February 12, 2014.  (A. 761, 954-56.)  On April 10, 2014, RA Nyereyemhuka made the same request with respect to the 2006 year, and Acting Supervisory Revenue

Agent Michael Anderson approved the request on the same day. (A. 762, 957-59.) The IRS first notified taxpayers of its determination that they were liable for accuracy-related penalties attributable to their substantial understatements of income tax (§ 6662(b)(2)) by letter dated July 18, 2014. (A. 843, 846, 850.)

The IRS later reassigned taxpayers' case from RA Nyereyemhuka to Revenue Agent Sandra Lyons. RA Lyons determined that taxpayers were also liable for the accuracy-related penalty for "negligence or disregard of rules or regulations" under § 6662(b)(1).[4] That initial determination was personally approved in writing by RA Lyons' immediate supervisor on November 4, 2014. (A. 981-991.) The IRS first notified taxpayers of the alternative basis for the accuracy-related penalty by letter dated November 3, 2014 (A. 962, 964, 979), but the letter was not deposited with the U.S. Postal Service until November 5, 2014 (A. 993-994).

---

[4] Because there is no "stacking" of § 6662 accuracy-related penalties, the additional assertion of the negligence penalty had no effect on the amount of the penalty proposed in the July 2014 letter. *See* Treas. Reg. § 1.6662-2(c).

-11-

## G.    Notice of deficiency and Tax Court proceedings

The IRS mailed taxpayers a statutory notice of deficiency regarding the accuracy-related penalties on January 9, 2015.  (A. 764.) The notice stated that the penalty applied because their underpayment of tax was attributable to a substantial understatement of income tax and was also attributable to their negligence or disregard of rules or regulations (listed as a "First Alternative Position").  (A. 764-781.) Taxpayers petitioned the Tax Court for a redetermination.  (A. 40.) The Commissioner alleged in his answer that taxpayers were also liable for fraud penalties under I.R.C. § 6663.  (A. 73.)  The Commissioner later withdrew his assertion of fraud penalties.  (A. 433.)

The Tax Court held for the Commissioner on cross-motions for summary judgment.  In upholding the substantial understatement penalties, the court held that (1) the Commissioner satisfied his burden of establishing compliance with the written supervisory approval requirement of I.R.C. § 6751(b); (2) the amended returns were not "qualified amended returns" — and therefore did not preclude the applicability of the penalties — because they were filed after service of the John Doe summons on UBS; and (3) the notice of deficiency was

15256057.1

timely because the issuance of the John Doe summons suspended the limitations period for a sufficient period of time by operation of I.R.C. § 7609(e).  In holding for the Commissioner on the supervisory approval issue (§ 6751(b)), the court denied taxpayers' request that the Commissioner be precluded from relying on Forms 5345-D as a discovery sanction.

## SUMMARY OF ARGUMENT

It is undisputed that taxpayers underpaid their 2006 and 2007 income tax, and that the underpayments were attributable to substantial understatements of income tax — as defined by I.R.C. § 6662(d)(1)(A) — on their original returns.  Accordingly, taxpayers are liable for penalties under § 6662 equal to 20% of the underpayments.  On cross-motions for summary judgment, the Tax Court correctly rejected each of their arguments to the contrary.

1.    The Commissioner satisfied his burden of showing that the "initial determination" to assess each penalty was "personally approved (in writing) by the immediate supervisor of the individual making such determination."  I.R.C. § 6751(b)(1).  RA Nyereyemhuka made the initial determinations when he completed Forms 5345-D to seek

approval to open up taxpayers' 2006 and 2007 returns for examination.

He indicated on each form that the reason for his request was "to assess

penalties on amended return that does not meet the qualified amended

tax returns criteria," and that the "Follow-up Actions" would be to

"Open up tax year" and "Assess accuracy penalty."  He submitted the

forms to two different supervisors, and each signed the form indicating

his approval.

The Tax Court correctly rejected taxpayers' challenges to the

approvals.  Taxpayers' argument on appeal that the initial

determination must specify the particular type of accuracy-related

penalty under § 6662 — here, the substantial understatement penalty

— is waived because they failed to raise it below.  In any event, the Tax

Court cases they cite in support of that contention are inapposite.  And

taxpayers have failed to show that the Tax Court abused its discretion

in rejecting their request to exclude the Forms 5345-D from the

summary judgment record as a discovery sanction.

2.    The Tax Court correctly held that taxpayers' amended

returns were not "qualified amended returns" within the meaning of

Treas. Reg. § 1.6664-2(c)(3) and therefore did not preclude the

applicability of penalties. The amended returns were not "qualified" because taxpayers filed them in 2010, after the IRS had served the John Doe summons on UBS. Taxpayers contend, however, that the "John Doe" exception does not apply to them because, in omitting gross income on their original returns (rather than affirmatively claiming unauthorized deductions), they did not "claim[ ] any tax benefit on th[os]e return[s] directly or indirectly" as contemplated in the regulation. The Tax Court correctly rejected that cramped reading as inconsistent with the language of the regulation and one of the regulatory examples. Taxpayers' interpretation would also create perverse incentives for taxpayers to try to avoid penalties by hiding from the IRS the manner in which they are understating their income.

3. The Tax Court correctly rejected taxpayers' contention that the John Doe summons did not operate to suspend the statute of limitations (or did not operate to suspend it long enough) under I.R.C. § 7609(e) and that the notice of deficiency was therefore untimely. First, the court rejected taxpayers' argument that, based on alleged remarks by IRS representatives in 2008 that the summons would be issued in order to suspend the statute of limitations, the summons was

illegal for lack of a "legitimate purpose." Aside from erroneously focusing on whether the summons was judicially enforceable rather than whether it was properly issued, this argument ignores taxpayers' acknowledgment elsewhere that the IRS used the summons as leverage to ensure that UBS produced all requested information.

The Tax Court also correctly held that the statute of limitations was suspended for a sufficient period of time under § 7609(e) to render the notice of deficiency timely. The suspension under § 7609(e) ends on the date on which there is a final resolution of the summoned party's response. Here, "final resolution" occurred when the IRS withdrew the summons on November 15, 2010, which is consistent with a public announcement by Swiss tax authorities as to when compliance was completed.

Taxpayers contend that "final resolution" occurred when the United States and UBS stipulated to dismiss the enforcement petition without prejudice, notwithstanding that the parties simultaneously agreed that the dismissal would have no effect on the summons or its enforceability. Taxpayers' argument is inconsistent with the regulation,

which provides that final resolution occurs only when the summons is "fully complied with."

The Court may also affirm the Tax Court's decision that the statute of limitations remained open on an alternative basis. There is no dispute that Johannes Lamprecht controlled a foreign corporation (Paro, Inc.) during the years at issue. For that reason, he was required to supply certain information about Paro with his returns. Treas. Reg. § 1.6038-2(a), (i). Because he failed to do so, the statute of limitations for 2006 and 2007 remains open until three years after the IRS receives the information. I.R.C. § 6501(c)(8).

The Tax Court's decision is correct and should be affirmed.

## ARGUMENT

### The Tax Court correctly sustained the IRS's assertion of accuracy-related penalties against taxpayers

#### Standard of review

The Tax Court's grant of summary judgment is reviewed de novo. *Ryskamp v. Commissioner*, 797 F.3d 1142, 1147 (D.C. Cir. 2015). The Tax Court's evidentiary rulings are reviewed for an abuse of discretion. *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 612 (D.C. Cir. 2010).

-17-

## A.    Introduction

Section 6662(a) of the Code imposes a 20% accuracy-related penalty on an underpayment of tax if the underpayment is attributable to a substantial understatement of income tax.  § 6662(b)(2).  An understatement is substantial if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return.  § 6662(d)(1)(A).  Section 6662(a) also imposes a 20% penalty if the underpayment is attributable to "negligence or disregard of rules or regulations" ((b)(1)), or several other causes ((b)(3)-(b)(10)).  And the penalty is increased to 40% or 50% of the underpayment under the circumstances described in § 6662(h), (i), (j), or (l).  Absent the applicability of one of those enhancement provisions, the maximum penalty is 20% of the underpayment even if the underpayment resulted from both negligence and a substantial understatement of income tax.  Treas. Reg. § 1.6662-2(c).  In this case, the IRS determined that taxpayers were liable for the accuracy-related penalty based on their substantial understatements of income tax ((b)(2)) and, in the alternative, their negligence or disregard of rules or regulations ((b)(1)).  (A. 781.)

The Commissioner bears the burden of production with regard to penalties asserted against individuals. I.R.C. § 7491(c); *see Higbee v. Commissioner*, 116 T.C. 438, 446 (2001); *see also Chai v. Commissioner*, 851 F.3d 190, 222 (2d Cir. 2017). The Commissioner's burden includes establishing compliance with the written supervisory approval requirement of I.R.C. § 6751(b)(1). *Chai*, 851 F.3d at 221. Once the Commissioner meets his burden of production the taxpayer must come forward with persuasive evidence that the Commissioner's assertion of penalties is incorrect. *Higbee*, 116 T.C. at 447; *see* Tax Court Rule 142(a).

Taxpayers concede that they understated their income tax by more than 10% of the tax required to be shown on their returns (and that each understatement far exceeds $5,000). (A. 459, 496.) On appeal, they renew their contention below that they are nonetheless not liable for the penalties for three reasons. First, they argue that the Commissioner failed to satisfy his burden of establishing compliance with the written supervisory approval requirement of I.R.C. § 6751(b). Second, they contend that their amended returns were "qualified amended returns" that precluded the applicability of the penalties.

15256057.1

Third, they argue that the notice of deficiency was untimely. The Tax Court correctly rejected each argument.

### B. The Commissioner demonstrated that the initial determinations to assess penalties were personally approved in writing by the revenue agent's immediate supervisors

I.R.C. § 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." Under Tax Court precedent, the written supervisory approval must be obtained not merely before the IRS assesses the penalty (which, in the case of accuracy-related penalties, occurs only after issuance of a notice of deficiency and any Tax Court challenge thereto), but "before the IRS formally communicates to the taxpayer its determination that the taxpayer is liable for the penalty." (A. 1391.) *But see infra* Part B.5. Applying that precedent, the Tax Court correctly held the undisputed facts demonstrated that RA Nyereyemhuka made the initial penalty determinations, and his immediate supervisors personally approved them in writing, before the formal communication of the determinations to taxpayers by means of the IRS's July 18, 2014, letter. (A. 1395-99.)

Taxpayers make three arguments in support of their assertion that the Tax Court erred in holding that the Commissioner satisfied his burden as to the § 6751(b) issue. They contend first that the Forms 5345-D were not "initial determinations" to assess penalties. (Br. 19-23.) They next contend that the supervisory approvals were ineffective because RA Nyereyemhuka did not sign the Forms 5345-D before submitting them to his supervisors. (Br. 23-25.) Third, taxpayers contend that the Tax Court should have excluded the Forms 5345-D as a discovery sanction. (Br. 25-33.) As we will show, none of these arguments has merit. At all events, the Commissioner established supervisory approval for imposition of the accuracy-related penalty on the alternative basis that the underpayments at issue were attributable to taxpayers' negligence or disregard of rules or regulations. Accordingly, if this Court were to conclude that the Commissioner failed to satisfy his burden regarding the § 6751(b) issue as applied to the substantial understatement penalty, then remand would be appropriate to allow the Commissioner to prove taxpayers' negligence at trial.

-21-

### 1. The Forms 5345-D reflect that the Revenue Agent made the initial determinations to assess penalties

RA Nyereyemhuka, while examining taxpayers' return for 2010, used Forms 5345-D ("Examination Request-ERCS (Examination Returns Control System) Users") to seek approval to open taxpayers' 2006 and 2007 returns for examination. On each form, he stated that the "Reason for [the] Request" was "to assess penalties on amended return that does not meet the qualified amended returns criteria," and that the "Follow-up Actions" would be to "Open up [the] tax year" and "Assess accuracy penalty." (A. 761-762.) The Tax Court correctly held that because the forms sufficiently identified the penalty being determined, the reason for doing so, and the proposal that the penalty was to be assessed, the forms reflected RA Nyereyemhuka's "initial determinations" that taxpayers were liable for accuracy-related penalties for the years at issue. (A. 1395.)

Taxpayers first contend that the Forms 5345-D submitted by RA Nyereyemhuka do not reflect initial determinations that penalties should be assessed against them. Specifically, taxpayers contend that in completing those forms, RA Nyereyemhuka used the word "assess"

-22-

(as in "assess penalties" and "[a]ssess accuracy penalty") not in its technical tax sense (*i.e.*, the means by which the IRS ultimately records a taxpayer's liability, *see* I.R.C. §§ 6201, 6665(a), 6751(b)(1)), but in the layman's sense of ascertaining *whether* to assert the applicability of penalties in the first place.  (Br. 20.)  "Otherwise," taxpayers contend, RA Nyereyemhuka would have been determining the applicability of a penalty for 2006 and 2007 before the examination of those years had even begun, which would amount to "arbitrary and capricious behavior" on the part of the IRS.  (*Id.*)

Taxpayers' interpretation of the Forms 5345-D not only ignores the technical meaning of the word "assess" in this context, but also requires the insertion of words that RA Nyereyemhuka did not use.[5] That is, if RA Nyereyemhuka had intended to use the word "assess" in the sense urged by taxpayers, he would have written something like "assess *the applicability of* penalties" or "[a]ssess *whether to assert* accuracy penalty."  Moreover, taxpayers' suggestion that RA

---

[5] Taxpayers ask this Court to draw a negative inference regarding RA Nyereyemhuka's "intent" from the fact that the Commissioner did not proffer his affidavit.  (Br. 21.)  Where the meaning of a document is evident from its face (as is the case here), resort to testimony of intent is unnecessary.

Nyereyemhuka could not have made an initial determination as to the applicability of penalties before opening up the relevant years for audit ignores the fact that, in the course of his audit of taxpayers' 2010 return, RA Nyereyemhuka had received copies of taxpayers' original and amended 2006 and 2007 returns through an Information Document Request.  (A. 1387.)  And the fact that the understatement on each original return exceeds $5,000 and 10% of the amount required to be shown is readily apparent upon a cursory review of the amended returns.  (A. 678, 716.)

Next, taxpayers contend for the first time that the completed forms are not sufficient "initial determinations" capable of supervisory approval because they do not specify which paragraph of § 6662(b) supports the penalty.[6]  (Br. 20.)  Because taxpayers did not raise that argument below, they have forfeited it.[7]  *E.g., Selden v. Airbnb, Inc.*, 4

---

[6] Taxpayers also repeat their suggestion below that the initial determination must include a calculation of the penalty.  (Br. 20.)  As was the case below, taxpayers cite no authority for that proposition.

[7] The "specific paragraph" argument is absent from taxpayers' discussion of the forms in their memorandum in opposition to the Commissioner's motion for summary judgment (SA. 61-66), their memorandum in support of their own motion for summary judgment

(continued…)

-24-

F.4th 148, 158 n.4 (D.C. Cir. 2021).  In any event, the Tax Court cases

taxpayers cite — *McCarthy v. Commissioner*, 119 T.C.M. (CCH) 1514,

2020 WL 2919522 (T.C. 2020), *Palmolive Bldg. Invs., LLC v.*

*Commissioner*, 152 T.C. 75 (2019), and *Campbell v. Commissioner*, 119

T.C.M. (CCH) 1266, 2020 WL 1686382 (T.C. 2020) — do not establish

the specificity requirement taxpayers advocate (and are of course not

binding on this Court even if they did).

McCarthy*, *Palmolive*, and *Campbell* all espouse the proposition

that when the IRS asserts multiple grounds for an accuracy-related

penalty under § 6662, each ground must be "separately approved for

purposes of section 6751(b)."  *Palmolive,* 152 T.C. at 87; *McCarthy*, 2020

WL 2919522, at *11 (quoting this language) & n.10; *Campbell*, 2020 WL

1686382, at *10 (noting that *Palmolive* "held that the section 6662(a)

and (h) penalties are distinct … , and the initial determination under

each subsection must be separately approved for purposes of section

6751(b)(1)," and holding that the IRS therefore failed to satisfy

§ 6751(b) because the Commissioner's documentary evidence "does not

_____

(SA. 91), and their reply memorandum in support of their motion (SA.
98-102).

show separate approval for the section 6662(a) and (h) penalties"). The problem that the *Palmolive* quote addresses — ensuring that each distinct ground for an accuracy-related penalty (which have different requirements) receives the requisite approval — is not present in cases where only one ground is asserted. None of the cited cases holds that when the IRS notifies a taxpayer of a single ground for an accuracy-related penalty (here, the "substantial understatement" ground of § 6662(b)(2), communicated to taxpayers in July 2014), the previously approved determination must specify that ground.[8] Accordingly, taxpayers' reliance on them is misplaced.

### 2. The initial determinations were properly approved

Taxpayers' argument captioned simply "Approval" is difficult to decipher. (Br. 23-25.) As best we understand this argument, taxpayers contend that the approvals were inadequate because the Commissioner

---

[8] In *McCarthy*, a case where the Commissioner ultimately abandoned all but one of the initially communicated grounds under § 6662, the court seemed to suggest that the "separate approval of multiple grounds" language in *Palmolive* might support the specificity requirement taxpayers seek in the context of a "single ground" accuracy-related penalty. Notably, the judge in our case also authored the *Palmolive* opinion, and he clearly did not view that opinion as supporting taxpayers' position.

did not establish that RA Nyereyemuka personally prepared Forms
5345-D and signed them before they were approved.  But taxpayers cite
no authority for their assertion that the revenue agent must sign
anything or testify that they personally prepared the form that
demonstrates supervisory approval.  To the contrary, "[t]he statute does
not require any particular writing by the individual making the penalty
determination, nor any signature or written name of that individual."
*Palmolive,* 152 T.C. at 86.  And RA Nyereyemuka's supervisors asserted
by affidavit that they approved the initial determinations.  (A. 954-55,
957-58.)

### 3.  Taxpayers did not establish that the Forms 5345-D should be excluded as a discovery sanction

Taxpayers next contend that the Tax Court should have excluded
the Forms 5345-D from the summary judgment record as a discovery
sanction.  They contend that the names of the supervisors should have
been disclosed in response to Interrogatory No. 10 ("Please identify any
persons known to you who have any knowledge of the facts of this case")
or in response to an order partially enforcing taxpayers' motion to
compel.  (Br. 26; A. 368.)  And they contend that the forms should have
been produced in response to Document Request No. 7 ("All documents

-27-

on which you intend to rely at trial") or in response to an order to

exchange trial documents.  (Br. 27; A. 386.)  Since the Commissioner did

not disclose the names or produce the forms prior to moving for

summary judgment, taxpayers contend that the Tax Court should have

excluded the forms from the summary judgment record.

The Tax Court's refusal to exclude evidence as a discovery

sanction is reviewed for an abuse of discretion, and "[u]nder the abuse

of discretion standard that governs discovery disputes, a trial court's

authority is at its zenith." *U.S. ex rel. Folliard v. Gov't Acquisitions,*

*Inc.*, 764 F.3d 19, 26 (D.C. Cir. 2014).  The highest level of deference is

due here because the Tax Court was deeply involved in resolving many

discovery disputes.  It noted that the cross-motions for summary

judgment followed "a lengthy series of discovery disputes," citing six of

its orders.  (A. 1389, n.12, citing A. 413, 471, 501, 526, 584, 594.)  Just

three of those orders extend over 47 single-spaced pages of analysis.  (A.

471-490, 501-523, 526-536.)

In rejecting taxpayers' argument regarding the Forms 5345-D, the

Tax Court stated that taxpayers "do not fairly present the document

request or our order on the motion to compel." (A. 1397.) On appeal, taxpayers continue their unfair presentation of the record.

Taxpayers assert that "The Commissioner was ordered to disclose the names and contact information of all persons who have any knowledge of the facts of this case by Judge Gustafson on September 26, 2017." (Br. 26; *see id*. at 32 (referring to the court's "order that the Commissioner was required to identify persons with knowledge of the case").) In fact, the Tax Court only ordered the Commissioner to disclose persons who "provided documents to the IRS" (Interrogatory No. 3), and persons who might be called to testify "on the subject of fraud" (Interrogatories Nos. 6-11). (A. 414.) Since the supervisors did not "provide documents to the IRS" and were not potential witnesses in support of the proposed fraud penalty, their names were not responsive.[9]

Taxpayers further contend that "By order entered on January 23, 2018, Judge Gustafson ordered the Commissioner to exchange (produce) all documents on which they intend to rely with respect to IRS

---

[9] As indicated above, the Commissioner subsequently withdrew his assertion of a fraud penalty. (A. 433.)

compliance with 26 U.S.C. § 6751(b) by February 22, 2018." (Br. 27; *see id*. at 32 (referring to the court's "order that the Commissioner exchange documents with respect to 26 U.S.C § 6751(b)").) In fact, having set a trial date of March 8, 2018, for the § 6751(b) issue, the court ordered the parties "to exchange documents on which they intend to rely at trial" by February 22, 2018. (A. 430.) Although taxpayers complain that "[n]o documents were produced by the Commissioner in response to this order" (Br. 27), they fail to mention that the court struck the case from the trial calendar by order dated February 21, 2018. (A. 434.)

Taxpayers note that in a February 20, 2018 status report filed with the court, the Commissioner stated that he "ha[d] written managerial approval for the substantial understatement penalty that satisfied the requirements of I.R.C. §6751(b)(1)," and that he "will introduce this evidence at trial on the merits of [taxpayers'] liability for the substantial understatement penalty, *if a trial is required*." (Br. 28 (emphasis added).) According to taxpayers, "[t]his admission placed the Forms 5345-D squarely within the scope of document request no. 7" — the March 2016 request to produce "[a]ll documents on which you

-30-

intend to rely at trial." (*Id.*; *see* A. 386.)  Taxpayers do not explain why,

given the Commissioner's specific reference to § 6751(b) documentation

and his added caveat ("if a trial is required"), they failed to simply

request a copy of the documentation at that time (rather than wait

three more years to rely on the generic document request from March

2016).  Given the Commissioner's February 2018 disclosure and

taxpayers' failure to follow up on it, their accusations of "sandbagging"

(Br. 28, 32) and document-hiding (*id.* at 29, 32) ring hollow.[10]

If taxpayers were still unprepared to oppose the Commissioner's

motion for summary judgment, they had a more appropriate avenue for

relief than seeking to strike evidence from the summary judgment

record.  They could have sought relief under Tax Court Rule 121(e), the

Tax Court's analogue of Rule 56(d), Fed. R. Civ. P.  The rule provides:

> If a nonmovant shows by affidavit or declaration that, for
> specified reasons, it cannot present facts essential to justify
> its opposition, the Court may:
>
> (1) defer considering the motion or deny it;

---

[10] The Commissioner's February 2018 disclosure also undermines
taxpayers' suggestion that, until the Commissioner filed his motion for
summary judgment in February 2021, they "were led to believe" that no
such "written determination existed."  (Br. 27.)

-31-

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

If any added discovery might have prevented entry of summary judgment, then taxpayers could have sought such discovery by appropriate means.  Since taxpayers did not do so, the Tax Court cannot have abused its discretion in denying their more draconian request to preclude the Commissioner from relying on the Forms 5345-D.

Taxpayers have not shown how an earlier production of the Forms 5345-D or any further discovery could have led to the production of evidence that might have prevented the entry of summary judgment. The Tax Court found "no violation of our order," and held that the Commissioner could still rely on the Forms 5345-D to show compliance with § 6751(b).  (A. 1399.)  The court's decision was well within the bounds of its discretion.

### 4.    The Commissioner established supervisory approval of the initial determination to assess a penalty for negligence or disregard of rules or regulations

The Commissioner maintained that he was entitled to summary judgment that RA Lyons' supervisor had properly approved her initial

determination that taxpayers were liable for the § 6662(a) penalty on the alternative basis of their negligence or disregard of rules or regulations (§ 6662(b)(1)).  (A. 981, 991.)  The Commissioner did not seek summary judgment as to taxpayer's *liability* for the penalty on that basis, reserving that matter for trial.  (A. 1389, n.13.)  Since the Tax Court decided that taxpayers were liable for the penalty because of their substantial understatement of income tax, it did not reach the Commissioner's argument that the alternative basis for the penalty had been properly approved.  If this Court rejects the applicability of the substantial understatement penalty on the ground that RA Nyereyemhuka's initial determination was not properly approved, it should remand for the Tax Court to decide whether taxpayers are still liable for the accuracy-related penalty on the alternative basis that the underpayment was attributable to negligence.

### 5.    There are divergent views in the Federal Courts about when the penalty must be approved

Although not essential for review of the Tax Court's decision, the Court should be aware of a divergence of opinion on *when* the initial determination of a penalty must be approved to satisfy § 6751.  The Tax Court applied its own precedent requiring supervisory approval before

the time when the initial determination to assert a penalty is first

formally communicated to the taxpayer.  (A. 1391, n.15.)  *See Belair*

*Woods, LLC v. Commissioner*, 154 T.C. 1, 14–16 (2020).  But three

courts of appeals disagree with that view.  Those courts have held that

the supervisor's approval is timely so long as it precedes "assessment of

the penalty or, if earlier, before the relevant supervisor loses discretion

whether to approve the penalty assessment."  *Laidlaw's Harley*

*Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1074 (9th Cir.

2022); *accord*, *Kroner v. Commissioner*, 48 F.4th 1272, 1276-81 (11th

Cir. 2022); *Minemyer v. Commissioner*, No. 21-9006, 2023 WL 314832,

at *4 (10th Cir. Jan. 19, 2023).

We submit that the appellate decisions are correct and that the

Tax Court's "formal communication" deadline has no support in the

statutory text.  That said, this Court need not pick a side to resolve this

appeal because the approvals here preceded the earliest relevant date.

The substantial understatement penalties were approved when RA

Nyereyemhuka's two supervisors approved his initial determinations of

the penalties on February 12, 2014 (for 2007) and April 10, 2014 (for

2006).  (A. 761-62.)  The approvals thus preceded the date (July 18,

-34-

2014) on which taxpayers contend that the IRS first formally communicated to them its intent to assess the penalties. (Br. 8.)

### C.  Taxpayers' amended returns were not "qualified amended returns" — and therefore did not preclude the applicability of penalties — because they were filed after the IRS served the John Doe summons on UBS

A taxpayer may reduce the amount of an accuracy-related penalty by filing an amended return correcting the errors on the original return. If the taxpayer files the amended return before the earliest of five terminating events, then it is a "qualified amended return," and the penalty is based on the underpayment shown on the amended return rather than the original return. Treas. Reg. § 1.6664-2(c)(2)-(3). One of the terminating events is the service of a § 7609(f) (John Doe) summons "relating to the tax liability of a person, group, or class that includes the taxpayer . . . with respect to an activity for which the taxpayer claimed any tax benefit on the return directly or indirectly." Treas. Reg. § 1.6664-2(c)(3)(i)(D)(*1*).

Taxpayers do not dispute that the UBS summons "relat[ed] to the tax liability of a person, group or class that includes" them. *Id*. (Br. 35-36.) Rather, they contend that the "John Doe" terminating event does

-35-

not apply to them because omitting gross income on a return does not

constitute "claim[ing] any tax benefit *on the return* directly or

indirectly." *Id*. (emphasis added). (Br. 33-40.) The Tax Court correctly

rejected taxpayers' cramped interpretation of Treas. Reg. § 1.6664-

2(c)(3)(i)(D)(*1*) as unsupported by the text of the regulation, caselaw, or

the facts of their tax returns. (A. 1399-1406.)

### 1. The text of the regulation and example 5 demonstrate that omission of gross income is a claim of a tax benefit

The language in dispute is the regulation's reference to a tax

benefit having been "claimed … on the return directly or indirectly."

Treas. Reg. § 1.6664-2(c)(3)(i)(D)(*1*). The sheer breadth of the adverbial

qualifier "directly or indirectly" — which modifies the verb "claimed" —

counsels against a narrow interpretation of the term "claimed . . . on the

return." *Id*.[11]  Indeed, in claiming that their admitted omission of gross

income is not a "tax benefit *affirmatively* claimed by [them] on their

original 2006 and 2007 tax returns, either directly [or] indirectly,"

taxpayers betray that their narrow interpretation of the regulation

---

[11] The drafters wisely chose to use that broad qualifier rather than attempt to list the many ways a taxpayer might claim a tax benefit on a return.

requires the insertion of a word the drafters did not use.  (Br. 37 (emphasis added); *see id*. at 40 (referring to "a tax benefit *affirmatively* taken by the Lamprechts") (emphasis added).)  The regulation, of course, does not require that the tax benefit have been "affirmatively" claimed on the return.

The regulation includes several examples that "illustrate the provisions of paragraphs (c)(3) and (c)(4)," Treas. Reg. § 1.6664-2(c)(5), and example 5 — a close match to this case — reflects a broad reading of § 1.6664-2(c)(3)(i)(D).  In the example the IRS served a John Doe summons on a credit card company requesting information relating to U.S. taxpayers who had signature authority over credit cards issued by certain offshore banks.  The example holds that an amended return filed by one of the identified taxpayers "that showed an increase in [that taxpayer's] Federal income tax liability" was not a qualified amended return because it was filed after service of the summons.  *Id*. (Example 5).  That the example simply refers to "an increase in … Federal income tax liability" is consistent with the conclusion that, at least for purposes of § 1.6664-2(c)(3)(i)(D)(*1*), understatements of tax result from one or

more tax benefits having been "claimed … on the return directly or indirectly" — whether by acts of *o*mission or *co*mmission.

The use of a credit card issued by an offshore bank is one way to conceal unreported income deposited in, or earned on funds held in, a foreign bank account.  The drafters of example 5 — issued in 2005[12] — were likely influenced by the IRS's then recent experience seeking to identify taxpayers who omitted income through use of offshore bank accounts and then used credit cards to access the funds in the accounts.  For example, in 2002 the United States petitioned for leave to serve a John Doe summons on Visa International for information about customers with credit cards issued by banks in certain countries (including Switzerland).  (A. 996-97.)  The IRS was concerned with the growing problem of United States taxpayers "evading payment of United States taxes" by, *inter alia*, "concealing unreported taxable income" in offshore accounts and then "accessing those funds through the use of payment cards."  (A. 1003.)

---

[12] T.D. 9186, 2005-1 C.B. 790, 70 Fed. Reg. 10037-02 (Mar. 2, 2005).

-38-

The Lamprechts are in the same position as the taxpayer in example 5. After the IRS issued the summons to UBS the Lamprechts filed amended returns that showed an increase in their tax liability. They had understated their gross income on the original returns by omitting their UBS income, thereby claiming a tax benefit by understating their correct tax liability. It is immaterial whether they lowered their tax liability by concealing income or claiming improper deductions, credits, or other tax items.

We also agree with the Tax Court's observation that taxpayers' failure to report their foreign-source income is the functional equivalent of an invalid claim to exclude foreign earned income under I.R.C. § 911. (A. 1403-04.) U.S. taxpayers are subject to U.S. tax on their worldwide income. Treas. Reg. § 1.1-1(b); *Cook v. Tait*, 265 U.S. 47, 46 (1924). Section 911 allows a U.S. taxpayer to exclude a portion of his foreign earned income if his "tax home" is in another country. I.R.C. § 911(a)(1), (b)(2), (d)(1); *Rogers v. Commissioner*, 783 F.3d 320, 322 (D.C. Cir. 2015). A taxpayer claims the benefit by filing as part of his return a Form 2555, "Foreign Earned Income." Treas. Reg. § 1.911-7(a)(1). Under taxpayers' theory, a taxpayer who erroneously excludes

foreign-source income and claims that exclusion by filing Form 2555 has "claimed [a] tax benefit" on his return and is therefore ineligible to file a qualified amended return after the dates described in § 1.6664-2(c)(3)(i)(B), (D), or (E).  But a taxpayer who obscures his omission of foreign-source income by simply not reporting it at all is eligible to fix the error on a qualified amended return even after those dates.  Such a rule would create a perverse incentive to hide one's erroneous exclusions.  It would also run counter to I.R.C. § 6662(d)(2)(B)(ii), which incentivizes adequate disclosure as a means of reducing (or eliminating) the accuracy-related penalty for substantial understatements of income tax.

### 2.     Caselaw supports a broad interpretation of Treas. Reg. § 1.6664-2(c)(3)(i)(D)

At least one appellate opinion supports the proposition that one who omits income on a return thereby claims a tax benefit on that return.  In *Ruidoso Racing Ass'n, Inc. v. Commissioner*, 476 F.2d 502 (10th Cir. 1973), the court considered whether a corporation that operated a horse racetrack received a tax benefit from the majority stockholder's fraudulent acts.  The court explained that "[a] tax benefit

could arise in two ways: understatement of [(*i.e.*, claiming less)[13]]

income, and overstatement of business expense deductions," each of

which necessarily occurs on a return.  *Id*. at 506 (punctuation altered).

The court therefore held, *inter alia*, that the corporation enjoyed a "tax

benefit" because its "failure to report bar income reduced total income

and, hence, produced a tax benefit for the corporation."  *Id*.

    Taxpayers cite *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958),

and *United States v. Home Concrete & Supply, LLC*, 566 U.S. 478

(2012), for the unremarkable proposition that there is a difference

between "a person who omits income or gains from their tax return and

someone who claims a deduction to which they are not entitled."  (Br.

39.)  The distinction was material in *Colony* because the then-applicable

statute of limitations was extended when a taxpayer "omit[ted] from

gross income an amount properly includible therein which is in excess

of 25 per centum of the amount of gross income stated in the return."

357 U.S. at 29 (quoting former § 275(c)).  The taxpayer had accurately

reported its gross receipts but understated its gross income by

---

[13] Taxpayers baldly assert (Br. 40) that "[a]n omission is not a
claim," but one who omits income on a return is necessarily claiming
that his income is less than the correct amount.

overstating its basis in real estate held for sale.[14]  The Court held that the statute was ambiguous, but its legislative history persuaded the Court that Congress "was addressing itself to the specific situation where a taxpayer actually omitted some income receipt or accrual in his computation of gross income, and not more generally to errors in that computation arising from other causes."  *Id.* at 33.  The Court reached the same result in *Home Concrete*, reviewing a subsequent reenactment (with minor changes) of the same provision at issue in *Colony*.  566 U.S. at 483.

The Tax Court correctly distinguished both cases, observing that they do not address "even tangentially" whether omissions of gross income constitute the "claim[ing of] any tax benefit on the return directly or indirectly" under Treas. Reg. § 1.6664-2(c)(3)(i)(D)(*1*).  (A. 1404.)  Neither *Colony* nor *Home Concrete* sheds any light on the proper interpretation of that regulation.[15]

---

[14] Gross income includes "[g]ains derived from dealings in property," *i.e.*, the amount realized from a sale of property *less* the taxpayer's basis in the property.  I.R.C. § 61(a)(3); *see* I.R.C. § 1001(a).

[15] Congress legislatively overruled *Home Concrete* in 2015.  The relevant Code section now provides that, for purposes of the six-year statute of limitations in § 6501(e)(1), an "understatement of gross

(continued…)

**3.    In any event, taxpayers affirmatively claimed a tax benefit from the omitted income on their initial returns by claiming itemized deductions that otherwise would have been reduced**

Even if taxpayers were correct (and they are not, *see supra* Part C.1) that one must *affirmatively* claim a tax benefit on the face of the tax return to come within the scope of Treas. Reg. § 1.6664-2(c)(3)(i)(D)(*1*), they did just that by claiming itemized deductions in amounts that exceeded the amounts to which they were entitled based on their correct (unreduced) income.  On their 2006 return taxpayers reported adjusted gross income of $1,073,652 (A. 615, ln. 37) and itemized deductions totaling $205,801.  (A. 617, lns. 9, 14, 18.)  But I.R.C. § 68 limited itemized deductions for taxpayers with adjusted gross income greater than an inflation-adjusted "applicable amount." Taxpayers' 2006 adjusted gross income exceeded the "applicable amount" even without the unreported income, so they reduced their claim for itemized deductions on that initial return to $187,388 based on the statutory formula.  (A. 617, ln. 28.)

---

income by reason of an overstatement of unrecovered cost or other basis is an omission from gross income."  I.R.C. § 6501(e)(1)(B)(ii).

15256057.1

When taxpayers reported the previously omitted income on their amended 2006 return, their adjusted gross income increased to $2,816,833.  (A. 678, ln. 1.)  They therefore further reduced their claim for itemized deductions to $152,481.  (*Id*., ln. 2.)  Consequently, they affirmatively claimed a tax benefit on their original 2006 return that resulted from their omission of income.  The amount of that benefit was $34,857, the difference between $187,388 deducted on the original return and $152,481 deducted on the amended return.  (*Id*., ln. 2.)  For the same reason, taxpayers affirmatively claimed a tax benefit ($74,037) on their original 2007 return that resulted from their omission of income.  (A. 716, ln. 2.)

In sum, taxpayers' amended returns were not "qualified amended returns" within the meaning of Treas. Reg. § 1.6664-2(c)(3) because taxpayers directly or indirectly claimed tax benefits on their original returns that resulted from their omission of income.

**D.    The notice of deficiency was timely because the issuance of the John Doe summons suspended the limitations period for a sufficient period of time by operation of I.R.C. § 7609(e)**

In general, the IRS has three years from the due date of a timely filed tax return in which to assess a tax or issue a statutory notice of

-44-

deficiency with respect to such return. I.R.C. §§ 6501, 6503. The period is extended to six years if the taxpayer omits from gross income more than 25% of the amount properly includible. I.R.C. § 6501(e)(1)(A). Taxpayers conceded that they omitted more than 25% of the amount properly includible and that the six-year limitations period applied. (A. 459, 496.)

Since both returns were timely filed, the six-year periods elapsed on April 15, 2013, for 2006 and April 15, 2014, for 2007. The notice of deficiency was mailed after those deadlines, on January 9, 2015. The notice of deficiency was timely, however, for four reasons: (1) service of the John Doe summons on UBS suspended the running of the six-year period for a sufficient amount of time pursuant to I.R.C. § 7609(e); (2) Johannes Lamprecht's failure to file a Form 5471, "Information Return of U.S. Persons With Respect to Certain Foreign Corporations," *see* I.R.C. § 6501(c)(8); (3) Johannes Lamprecht's failure to file certain information returns with respect to Ilara, *see* I.R.C. § 6501(c)(8); and (4) taxpayers' assertion of fraudulent positions on their 2006 and 2007 returns, *see* I.R.C. § 6501(c)(1). The Commissioner moved for summary judgment on the first two grounds and reserved the third and fourth

grounds for further development and/or trial, if necessary.  The Tax Court granted summary judgment on the first ground and did not address the second, third, and fourth grounds.  (A. 1407, n. 22.)

This Court should affirm the Tax Court's decision that the notice of deficiency was timely because the service of the John Doe summons suspended the running of the period of limitation for a sufficient amount of time pursuant to I.R.C. § 7609(e).  Alternatively, the Court may affirm because the record reveals no dispute as to any material fact that Johannes Lamprecht failed to file a Form 5471 for his foreign corporation, thereby implicating the special limitations period of I.R.C. § 6501(c)(8).  *See Queen v. Schultz*, 747 F.3d 879, 884 (D.C. Cir. 2014). If the Court declines to affirm on either ground, then it should remand so that the Commissioner can (1) argue that the limitations period was extended under § 6501(c)(8) by taxpayers' failure to file required information returns concerning their stiftung, Ilara, and/or (2) establish at trial that taxpayers filed fraudulent returns, thereby eliminating any limitations period.  *See* I.R.C. § 6501(c)(1).

### 1.    The statute of limitations was suspended for a sufficient period of time under I.R.C. § 7609(e)

Section 7609(e) provides that the statute of limitations is suspended for any person whose identity is sought under a John Doe summons if the summons is not resolved within six months of its service. The suspension commences on that six-month anniversary and continues until "the date on which there is a final resolution of the summoned party's response to the summons." Treas. Reg. § 301.7609-5(d). The United States served the summons on July 21, 2008 (A. 787), so the suspension began six months later, on January 21, 2009, and continued until the summons reached a "final resolution." *Id*.

Treas. Reg. § 301.7609-5(e)(3) defines the date on which there is a "final resolution" of the summoned party's response to the summons:

> **(3) Final resolution of the summoned third party's response to a summons.** For purposes of section 7609(e)(2)(B), final resolution with respect to a summoned party's response to a third-party summons **occurs when the summons** or any order enforcing any part of the summons **is fully complied with** and all appeals or requests for further review are disposed of, the period in which an appeal may be taken has expired or the period in which a request for further review may be made has expired. The determination of whether there has been full compliance will be made within a reasonable time, given the volume and complexity of the records produced, after the later of the giving of all testimony or the production of all records

> requested by the summons or required by any order
> enforcing any part of the summons.

Treas. Reg. § 301.7609-5(e)(3) (emphasis supplied).

Since there was no order enforcing the summons, the summons reached its "final resolution" when UBS fully complied with it. Although the record does not reflect the exact date on which UBS turned over the last document requested by the summons, the SFTA made a public announcement on November 16, 2010, that "the delivery of data by Switzerland to the United States was largely completed by mid-November." (A. 1377.) The IRS had withdrawn the summons by letter sent to UBS a day earlier (November 15, 2010). (A. 809.) Accordingly, UBS's compliance with the summons should be considered resolved on November 15, 2010. Taxpayers do not suggest an earlier date on which UBS fully complied with the summons. The suspension thus ran for 664 days, from January 21, 2009, through November 15, 2010. It follows that the statute of limitations for 2006 did not expire until 664 days after April 15, 2013 (February 7, 2015), and the statute of limitations for 2007 did not expire until 664 days after April 15, 2014 (February 7, 2016). The notice of deficiency issued on January 9, 2015, was therefore timely with respect to each tax year.

Taxpayers dispute the foregoing on two grounds. They contend that the summons was illegal (Br. 41-47), and that compliance with the summons was resolved not when UBS fully complied, but when the United States and UBS stipulated to dismiss the petition to enforce the summons (Br. 48-53). Taxpayers are barred from challenging the legality of the summons, and in any event, they have not shown that it was illegal. Nor have they shown that the summons was resolved earlier than November 15, 2010.

### a.    The John Doe summons was valid

Taxpayers challenge the legality of the summons on various grounds, including that the IRS issued the summons for an improper purpose. They rely on a 2009 declaration of Urs Zuluft, filed in the summons enforcement case, asserting that unnamed IRS representatives stated in June 2008 that the summons would be issued "in order to interrupt the statute of limitations." (A. 118; Br. 42.) Even if Zuluft's recollection of the statement is accurate, the statement does not help taxpayers.

Taxpayers' analysis garbles the relevant standards and factors. (Br. 41-47.) Under I.R.C. § 7609(f), the IRS may *serve* a John Doe

summons "only after a court proceeding in which" it establishes that

(1) the summons relates to the investigation of a particular person or

class of persons, (2) there is a reasonable basis for believing that such

person or class may have violated any provision of any internal revenue

law, and (3) the information sought to be obtained is not readily

available from other sources.  The United States made such a showing

before a district court, which authorized service of the summons.  (A.

784-85.)

　　　If the summoned party does not comply, then the United States

may apply for an *order enforcing the summons*.  To obtain such an order

the United States must show that (1) the investigation will be

conducted pursuant to a legitimate purpose, (2) the inquiry may be

relevant to that purpose, (3) the information sought is not already

within the IRS's possession, and (4) the administrative steps required

by the Code have been followed.  *United States v. Powell*, 379 U.S. 48,

57–58 (1964).

　　　The suspension of the statute of limitations pursuant to I.R.C.

§ 7609(e), however, occurs when compliance with the summons is not

resolved within six months.  Section 7609(e) does not require the United

-50-

States to repeat the showing under § 7609(f) for obtaining authorization to serve the summons, nor does it require the United States to make the showing required under *Powell* for obtaining an order enforcing the summons.

Taxpayers' suggestion that a summons is not valid for purposes of § 7609(e) unless the United States establishes the *Powell* requirements (Br. 43) is wrong. A summons need not be enforced by a district court in order to be validly served. § 7609(f). More to the point, a summons need not be enforced by a district court in order to remain unresolved for six months after service and thus suspend the statute of limitations. The "legitimate purpose" factor is part of the showing that must be made before a district court will enforce a summons. Taxpayers' argument that the summons was not *valid* because the United States did not establish the requirements for judicial *enforcement* confuses the showing that the United States made under § 7609(f) (service) with a showing it was *not* required to make (enforcement), *i.e.*, because UBS's compliance was resolved through a settlement.

In any event, taxpayers are barred from disputing the validity of the summons because a district court approved its issuance in 2008. (A.

784-85.)  A district court's prior determination that the United States
established the three facts required by I.R.C. § 7609(f) is not subject to
challenge in any subsequent enforcement proceeding.  *United States v.
Samuels, Kramer & Co.*, 712 F.2d 1342, 1346 (9th Cir. 1983); *United
States v. Ernst & Whinney*, 750 F.2d 516, 518 (6th Cir. 1984); *Matter of
Does*, 688 F.2d 144, 149 (2d Cir. 1982).  If the summoned party cannot
challenge the issuance of a John Doe summons in an enforcement
proceeding, there is no reason to presume that a taxpayer can challenge
it in a deficiency proceeding.

Still, the Commissioner introduced some of the evidence from the
(settled) enforcement proceeding to show that it issued the summons for
a legitimate purpose.  In particular, the declaration of Daniel Reeves
asserted that the purpose of the summons was to seek documents from
UBS that would help the IRS identify and investigate U.S. taxpayers
that had violated U.S. laws by failing to report the existence of foreign
bank accounts under their ownership or control and failing to report
and pay U.S. income taxes on income earned in those accounts.  (A.
1059, 1062.)  The summons followed a report of the Senate Permanent
Subcommittee on Investigations (PSI) titled "Tax Haven Banks and

U.S. Tax Compliance," in which the PSI concluded that UBS had tried to open accounts in Switzerland for wealthy U.S. clients in a manner that had resulted in tax evasion.  (A. 1095.)  UBS officials told the subcommittee that it maintained accounts for about 19,000 U.S. clients that had not been declared to U.S. authorities, and that those accounts held about $18 billion in assets.  (A. 1065.)  Against this evidence of the Government's need for account holder information, Zulauf's declaration stating that unidentified IRS employees indicated the summons would be issued "to interrupt the statute of limitations" (A. 118) does not negate the "legitimate purpose" of the summons under *Powell*.

Moreover, taxpayers conceded that the IRS "wanted to use the UBS Summons as leverage against Switzerland to ensure that UBS met its obligations under the UBS Settlement Agreement."  (A. 1408-09, quoting SA. 77.)  On this point, taxpayers were apparently relying on a Swiss government report stating essentially the same thing.  (A. 840-41, 919.)  Therefore, in taxpayers' own characterization of events, the IRS wanted to use the summons as leverage against Switzerland to ensure UBS met its obligations.  That UBS produced the information under the auspices of the U.S.-Switzerland tax treaty (as contemplated in the

-53-

August 2009 agreement between the two countries) is no indication that the summons was not helpful in the production of documents or that the summons was not issued in good faith.

Finally, even if taxpayers could (1) challenge the validity of the summons, and (2) establish that the summons was invalid, they have not shown that the § 7609(e) suspension of the limitations period would be negated as a result. Nothing in the statute or regulations supports the proposition that the suspension can be retroactively nullified by attacking the validity of the summons.

> **b.  The summons reached its final resolution when it was withdrawn on November 15, 2010**

Taxpayers contend that even if the summons suspended the statute of limitations on January 21, 2009, the suspension ended on August 19, 2009, when the district court action was dismissed, rather than November 15, 2010, when the IRS released UBS from the summons. (Br. 48-53.) Taxpayers' analysis is contrary to the governing regulation.

As noted above, Treas. Reg. § 301.7609-5(e)(3) provides that final resolution

15256057.1

-54-

> occurs when the summons or any order enforcing any part of
> the summons is fully complied with and all appeals or
> requests for further review are disposed of, the period in
> which an appeal may be taken has expired or the period in
> which a request for further review may be made has expired.

Here, about a month after the United States served the summons it

petitioned to enforce it.  The government of Switzerland participated as

amicus.  But the district court did not order enforcement of any part of

the summons.  The suit was ultimately resolved through two out-of-

court agreements, both executed August 19, 2009.  One agreement

between the United States and Switzerland established a mechanism

for obtaining the information under the procedures set forth in the tax

treaty between the two countries.  (A. 921.)  A second agreement,

between the United States and UBS, provided that UBS would begin

producing the documents demanded in the summons to the SFTA on a

rolling basis under an agreed schedule and that its compliance would be

monitored by Swiss authorities.  (A. 923.)  UBS and the United States

agreed the summons enforcement case would be dismissed but that the

dismissal "shall, in and of itself, have no effect on the UBS Summons or

its enforceability."  (A. 921.)  Finally, the parties agreed that the IRS

would withdraw the summons with prejudice after receiving the

-55-

requested information from UBS, but "if UBS fails to comply in any material respect with any of its obligations" to produce the information, then "the IRS is not obligated to withdraw the UBS Summons." (A. 924.) The agreement thus provided that the suit would be dismissed promptly but the summons would not be withdrawn until UBS provided the summoned information.

Since there was no order enforcing the summons, the suspension concluded when UBS fully complied with the summons. As is clear from the U.S.-UBS agreement, the summons had not been complied with when the agreement was executed on August 19, 2009, or when the suit was dismissed immediately afterward. Taxpayers suggest no other date for final resolution.

The record evidence indicates that the summons was fully complied with on or about November 15, 2010. That is the date on which the IRS formally withdrew the summons by letter. (A. 809.) The Swiss Federal Council in Bern issued a public statement on November 16, 2010, confirming the mid-November resolution date. The Council stated:

> The delivery of data by Switzerland to the United States was
> largely completed by mid-November after expiry of the

-56-

> appeal periods . . . . The Agreement thus having been
> substantially implemented, the Internal Revenue Service
> (IRS) fully and definitively withdrew the John Doe Summons
> against UBS on 15 November 2010.

(A. 1377.)  Taxpayers presented no evidence that the summons had

been complied with on any date other than November 15, 2010.

Taxpayers' arguments to the contrary (Br. 48-53) are a mashup of

misstatements and irrelevancies.  For example, taxpayers assert that

the regulation "explains that when litigation is undertaken to enforce a

summons" the final resolution occurs when court procedures are

complete, and the summons is quashed or enforced and there has been

full compliance.  (Br. 48.)  But that misstates the applicability of the

regulation, which does not refer to "when litigation is undertaken."  The

regulation states that final resolution takes place when "the summons

is fully complied with" or "any order enforcing any part of the summons"

is fully complied with and appeals are exhausted.  The provisions

regarding the completion of court procedures do not apply simply

because "litigation is undertaken," but only when there is an "order

enforcing any part of the summons."  The misstatement is significant

because the United States petitioned for enforcement and thus

undertook litigation, but the district court did not issue an order

-57-

enforcing any part of the summons.  Therefore, the language regarding the completion of court procedures is inapplicable despite the fact that litigation was undertaken.

Taxpayers' reliance on *United States v. Meador*, 138 F.3d 986 (5th Cir. 1998) (Br. 51-52) is inapt.  *Meador* interpreted 18 U.S.C. § 3292, which permits a district court, before an indictment, to grant a limited suspension of the statute of limitations when the United States needs to obtain evidence in a foreign country.  If granted, the extension ends when "the foreign court or authority takes final action on the request." The court interpreted "final action" to occur when the foreign government officially responds with what purports to be its final answer, even if it subsequently sends additional evidence.  *Id*. at 992-93.

Taxpayers rely on *Meador* for their argument that there must be a certain and definite end to the suspension period that does not depend on the IRS's determination that withdrawal of the summons is warranted.  (Br. 52-53.)  But the regulation elaborating on the meaning of "final resolution" addresses taxpayers' concern.  The IRS is afforded a

-58-

"reasonable" time to determine that a summoned party has fully

complied with a summons:

> The determination of whether there has been full compliance
> will be made within a reasonable time, given the volume and
> complexity of the records produced, after the later of the
> giving of all testimony or the production of all records
> requested by the summons or required by any order
> enforcing any part of the summons.

Treas. Reg. § 301.7609-5(e)(3). The regulation thus provides that even

after the summoned party produces the last of the summoned records,

the IRS has a "reasonable" amount of time to review the records and

determine that it has received all requested records, considering the

volume and complexity of those records. The analysis is somewhat

complicated on these facts not just because of the volume and

complexity of the records produced, but because the August 2009

agreements allowed UBS to produce records to SFTA to pass on to the

United States. In any event, the IRS's November 15, 2010, withdrawal

of the summons is consistent with the SFTA statement that its

"delivery of data" was "largely completed by mid-November." (A. 1377.)

Taxpayers offer no evidence that UBS or SFTA completed production

earlier than November 15, 2010, or that the IRS took an unreasonable

amount of time before withdrawing the summons.

-59-

### 2. Alternatively, the notice of deficiency was timely because Johannes Lamprecht failed to provide required information for the foreign corporation that he controlled, thereby implicating a special limitations provision

Section 6501(c)(8) creates another exception to the generally applicable limitations period. If a taxpayer is required to report information "under section 1298(f), 6038, 6038A, 6038B, 6038D, 6046, 6046A, or 6048" for a given year, then the time for making an assessment for that year does not expire until three years after the IRS receives the information. The referenced sections concern U.S. persons with specified foreign assets.

A U.S. person who controls a foreign business entity must furnish information to the IRS under I.R.C. § 6038(a). *Colliot v. United States*, No. 1:19-CV-212-LY, 2021 WL 2709676, at *4 (W.D. Tex. Mar. 24, 2021). If the entity is a corporation, then the controlling person is required to file with their tax return a Form 5471, "Information Return of U.S. Persons with Respect to Certain Foreign Corporations." Treas. Reg. § 1.6038-2(a), (i); *Flume v. Commissioner*, 113 T.C.M. (CCH) 1097, 2017 WL 394541 (T.C. 2017). A U.S. person includes a lawful permanent resident, which taxpayers were during 2006 and 2007.

15256057.1

-60-

Treas. Reg. § 1.6038-2(d); *see* I.R.C. § 7701(a)(30)(A). (A. 122.)

Therefore, if Johannes Lamprecht controlled a foreign corporation

during a particular year and failed to file a Form 5471 with his return

for that year, then the limitations period is still open for that year.

### a.    Johannes Lamprecht controlled Paro

A person controls a foreign corporation if they own stock that

comprises more than 50% of the total combined voting power of all

classes of stock entitled to vote, or more than 50% of the total value of

shares of all classes of stock. *See* I.R.C. §§ 318, 6038(e)(2); *Colliot*, 2021

WL 2709676, at *4. In the Tax Court taxpayers did not dispute that

Johannes Lamprecht controlled Paro. (A. 552; SA. 84.)

### b.    Paro is a foreign corporation

Taxpayers likewise did not contest that Paro was a corporation

but contended that it could be disregarded for U.S. tax purposes on the

basis of Rev. Proc. 2002-69, 2002-2 C.B. 831. Rev. Proc. 2002-69

permits "eligible" entities that are solely owned by spouses as

community property to elect to be disregarded for U.S. tax purposes.

Rev. Proc. 2002-69 does not apply here for two reasons. First, the

guidance applies only if an entity is wholly owned by spouses as

community property and no person other than the spouses is considered

an owner for tax purposes.  Rev. Proc. 2002-69, § 3.02.  But there is

evidence in the record that Johannes' brother owned 35% of Paro and

that Linda owned no part of it.  (A. 823.)  And taxpayers did not

establish that the shares of Paro, Inc., were community property.  They

asserted only that Paro was incorporated by Johannes Lamprecht's

parents, and that he "took over the shares of the company upon the

death of his parents."  (SA. 84, A. 941.)  Under California law, property

acquired by a married person by gift, bequest, devise, or descent is

separate property.  Calif. Family Code § 770(a)(2).  Paro, Inc. thus was

not eligible for classification under Rev. Proc. 2002-69.

Moreover, the point of the revenue procedure is that the

Commissioner will respect the election of a qualified entity.  The

spouses must affirmatively elect to disregard the entity, and they must

report its income on their joint return or on one spouse's separate

return.  Rev. Proc. 2002-69, § 4.01; Treas. Reg. § 301.7701-2(a).

Taxpayers did neither.  They did not file the requisite election and did

not report Paro's income on their original 2006 and 2007 returns.

Instead, they treated Paro as an undisclosed foreign entity used to

-62-

conceal income.  Accordingly, taxpayers cannot avail themselves of the option to reclassify Paro as a disregarded entity under Rev. Proc. 2002-69.

Since Johannes Lamprecht controlled a foreign corporation during 2006 and 2007, he was required to report the information required by I.R.C. § 6038 on Forms 5471 filed with his returns.  He failed to do so, and the statute of limitations on assessment of tax for those years does not expire until three years after he furnishes the required information to the IRS.  I.R.C. § 6051(c)(8).

\*        \*        \*        \*        \*

During 2006 and 2007 taxpayers also had an interest in a Liechtenstein stiftung called Ilara Familienstiftung ("Ilara") for which they failed to file informational returns, a failure that also results in an extension of the limitations period under § 6501(c)(8).  (A. 75-78.)  The Commissioner contends that Ilara is classified as a "foreign trust" for U.S. tax purposes.  (A. 84.)  *See Rost v. United States*, 44 F.4th at 302-03.  Taxpayers with foreign trusts are required to file annually with the IRS a Form 3520, "Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts" and, if the trust fails to

-63-

file, a Form 3520-A "Annual Information Return of Foreign Trust With a U.S. Owner."   I.R.C. § 6048(a), (b)(1); Treas. Reg. § 16.3-1(a) (2005). Taxpayers admitted that they did not file the foreign trust reporting forms, but denied they were required to do so.  (A. 102, 106.)  Because of the dispute over the tax status of Ilara, the Commissioner did not move for summary judgment on the failure to file the foreign trust forms.  If the Court reaches, but does not adopt, the § 6501(c)(8) argument as applied to Paro, then the Commissioner requests the opportunity on remand to argue that the limitations period was extended under that provision due to taxpayers' failure to file the required information returns relating to Ilara.

## CONCLUSION

The decision of the Tax Court is correct and should be affirmed.  If

the Court does not affirm the Tax Court's decision, it should remand for

the Commissioner to establish taxpayers' liability for the § 6662 penalty

for negligence or disregard of rules or regulations, or to establish that

(1) the limitations period remained open under § 6501(c)(8) as applied

to the required Ilara filings, or (2) no limitations period applies because

taxpayers filed fraudulent returns.

Respectfully submitted,

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

/s/ Robert J. Branman

| | |
|---|---|
| ARTHUR T. CATTERALL | (202) 514-2937 |
| ROBERT J. BRANMAN | (202) 307-6538 |
|   *Attorneys* | |
|   *Tax Division* | |
|   *Department of Justice* | |
|   *Post Office Box 502* | |
|   *Washington, D.C. 20044* | |

AUGUST 3, 2023

15256057.1

## CERTIFICATE OF COMPLIANCE

**Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements**

1.  This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[X]   this document contains 11,566 words, **or**

[ ]   this brief uses a monospaced typeface and contains _____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X]   this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Century Schoolbook 14, **or**

[ ]   this brief has been prepared in a monospaced typeface using _____ with _____.

(s)   _/s/ Robert J. Branman_

Attorney for _ Commissioner of Internal Revenue_

Dated:   _August 3, 2023_

# ADDENDUM

Table of Contents

26 U.S.C. § 6038(a)(1) ........................................................ 67

26 U.S.C. § 6501(a)-(e)(1) .................................................. 68

26 U.S.C. § 6662(a)-(d) ...................................................... 75

26 U.S.C. § 7609(f) ............................................................. 79

26 C.F.R. §1.6664-2(c)(2)-(3) ............................................ 80

26 C.F.R. § 301.7609-5 ...................................................... 83

.

15256057.1

## § 6038. Information reporting with respect to certain foreign corporations and partnerships, (a)(1)

(a) Requirement.--

(1) In general.--Every United States person shall furnish, with respect to any foreign business entity which such person controls, such information as the Secretary may prescribe relating to--

(A) the name, the principal place of business, and the nature of business of such entity, and the country under whose laws such entity is incorporated (or organized in the case of a partnership);

(B) in the case of a foreign corporation, its post-1986 undistributed earnings (as defined in section 902(c));

(C) a balance sheet for such entity listing assets, liabilities, and capital;

(D) transactions between such entity and--

(i) such person,

(ii) any corporation or partnership which such person controls, and

(iii) any United States person owning, at the time the transaction takes place--

(I) in the case of a foreign corporation, 10 percent or more of the value of any class of stock outstanding of such corporation, and

(II) in the case of a foreign partnership, at least a 10-percent interest in such partnership; and

-68-

(E)(i) in the case of a foreign corporation, a description of the various classes of stock outstanding, and a list showing the name and address of, and number of shares held by, each United States person who is a shareholder of record owning at any time during the annual accounting period 5 percent or more in value of any class of stock outstanding of such foreign corporation, and

(ii) information comparable to the information described in clause (i) in the case of a foreign partnership.

The Secretary may also require the furnishing of any other information which is similar or related in nature to that specified in the preceding sentence or which the Secretary determines to be appropriate to carry out the provisions of this title.

## § 6501 Limitations on assessment and collection, (a)-(e)(1)

(a) General rule.--Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. For purposes of this chapter, the term "return" means the return required to be filed by the taxpayer (and does not include a return of any person from whom the taxpayer has received an item of income, gain, loss, deduction, or credit).

(b) Time return deemed filed.--

(1) Early return.--For purposes of this section, a return of tax imposed by this title, except tax imposed by chapter 3, 4, 21, or 24, filed before the last day prescribed by law or by

regulations promulgated pursuant to law for the filing thereof, shall be considered as filed on such last day.

(2) Return of certain employment and withholding taxes.-- For purposes of this section, if a return of tax imposed by chapter 3, 4, 21, or 24 for any period ending with or within a calendar year is filed before April 15 of the succeeding calendar year, such return shall be considered filed on April 15 of such calendar year.

(3) Return executed by Secretary.--Notwithstanding the provisions of paragraph (2) of section 6020(b), the execution of a return by the Secretary pursuant to the authority conferred by such section shall not start the running of the period of limitations on assessment and collection.

(4) Return of excise taxes.--For purposes of this section, the filing of a return for a specified period on which an entry has been made with respect to a tax imposed under a provision of subtitle D (including a return on which an entry has been made showing no liability for such tax for such period) shall constitute the filing of a return of all amounts of such tax which, if properly paid, would be required to be reported on such return for such period.

(c) Exceptions.--

(1) False return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.

(2) Willful attempt to evade tax.--In case of a willful attempt in any manner to defeat or evade tax imposed by this title (other than tax imposed by subtitle A or B), the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

(3) No return.--In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

(4) Extension by agreement.--

(A) In general.--Where, before the expiration of the time prescribed for the assessment of any tax imposed by this title, except the estate tax provided in chapter 11, both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

(B) Notice to taxpayer of right to refuse or limit extension.-- The Secretary shall notify the taxpayer of the taxpayer's right to refuse to extend the period of limitations, or to limit such extension to particular issues or to a particular period of time, on each occasion when the taxpayer is requested to provide such consent.

(5) Tax resulting from changes in certain income tax or estate tax credits.--

For special rules applicable in cases where the adjustment of certain taxes allowed as a credit against income taxes or estate taxes results in additional tax, see section 905(c) (relating to the foreign tax credit for income tax purposes) and section 2016 (relating to taxes of foreign countries, States, etc., claimed as credit against estate taxes).

(6) Termination of private foundation status.--In the case of a tax on termination of private foundation status under section 507, such tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

(7) Special rule for certain amended returns.--Where, within the 60-day period ending on the day on which the time prescribed in this section for the assessment of any tax imposed by subtitle A for any taxable year would otherwise expire, the Secretary receives a written document signed by the taxpayer showing that the taxpayer owes an additional amount of such tax for such taxable year, the period for the assessment of such additional amount shall not expire before the day 60 days after the day on which the Secretary receives such document.

(8) Failure to notify Secretary of certain foreign transfers.--

(A) In general.--In the case of any information which is required to be reported to the Secretary pursuant to an election under section 1295(b) or under section 1298(f), 6038, 6038A, 6038B, 6038D, 6046, 6046A, or 6048, the time for assessment of any tax imposed by this title with respect to any tax return, event, or period to which such information relates shall not expire before the date which is 3 years after the date on which the Secretary is furnished the information required to be reported under such section.

(B) Application to failures due to reasonable cause.--If the failure to furnish the information referred to in subparagraph (A) is due to reasonable cause and not willful neglect, subparagraph (A) shall apply only to the item or items related to such failure.

(9) Gift tax on certain gifts not shown on return.--If any gift of property the value of which (or any increase in taxable gifts required under section 2701(d) which) is required to be shown on a return of tax imposed by chapter 12 (without regard to section 2503(b)), and is not shown on such return, any tax imposed by chapter 12 on such gift may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time. The preceding sentence shall not apply to any item which is disclosed in such return, or in a statement attached to the return, in a

manner adequate to apprise the Secretary of the nature of such item.

(10) Listed transactions.--If a taxpayer fails to include on any return or statement for any taxable year any information with respect to a listed transaction (as defined in section 6707A(c)(2)) which is required under section 6011 to be included with such return or statement, the time for assessment of any tax imposed by this title with respect to such transaction shall not expire before the date which is 1 year after the earlier of--

(A) the date on which the Secretary is furnished the information so required, or

(B) the date that a material advisor meets the requirements of section 6112 with respect to a request by the Secretary under section 6112(b) relating to such transaction with respect to such taxpayer.

(11) Certain orders of criminal restitution.--In the case of any amount described in section 6201(a)(4), such amount may be assessed, or a proceeding in court for the collection of such amount may be begun without assessment, at any time.

(12) Certain taxes attributable to partnership adjustments.-- In the case of any partnership adjustment determined under subchapter C of chapter 63, the period for assessment of any tax imposed under chapter 2 or 2A which is attributable to such adjustment shall not expire before the date that is 1 year after--

(A) in the case of an adjustment pursuant to the decision of a court in a proceeding brought under section 6234, such decision becomes final, or

(B) in any other case, 90 days after the date on which the notice of the final partnership adjustment is mailed under section 6231.

(d) Request for prompt assessment.--Except as otherwise provided in subsection (c), (e), or (f), in the case of any tax (other than the tax imposed by chapter 11 of subtitle B, relating to estate taxes) for which return is required in the case of a decedent, or by his estate during the period of administration, or by a corporation, the tax shall be assessed, and any proceeding in court without assessment for the collection of such tax shall be begun, within 18 months after written request therefor (filed after the return is made and filed in such manner and such form as may be prescribed by regulations of the Secretary) by the executor, administrator, or other fiduciary representing the estate of such decedent, or by the corporation, but not after the expiration of 3 years after the return was filed. This subsection shall not apply in the case of a corporation unless--

(1) (A) such written request notifies the Secretary that the corporation contemplates dissolution at or before the expiration of such 18-month period, (B) the dissolution is in good faith begun before the expiration of such 18-month period, and (C) the dissolution is completed;

(2) (A) such written request notifies the Secretary that a dissolution has in good faith been begun, and (B) the dissolution is completed; or

(3) a dissolution has been completed at the time such written request is made.

(e) Substantial omission of items.--Except as otherwise provided in subsection (c)--

(1) Income taxes.--In the case of any tax imposed by subtitle A--

(A) General rule.--If the taxpayer omits from gross income an amount properly includible therein and--

(i) such amount is in excess of 25 percent of the amount of gross income stated in the return, or

(ii) such amount--

(I) is attributable to one or more assets with respect to which information is required to be reported under section 6038D (or would be so required if such section were applied without regard to the dollar threshold specified in subsection (a) thereof and without regard to any exceptions provided pursuant to subsection (h)(1) thereof), and

(II) is in excess of $5,000,

the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time within 6 years after the return was filed.

(B) Determination of gross income.--For purposes of subparagraph (A)--

(i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services;

(ii) An understatement of gross income by reason of an overstatement of unrecovered cost or other basis is an omission from gross income; and

(iii) In determining the amount omitted from gross income (other than in the case of an overstatement of unrecovered cost or other basis), there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item.

-75-

(C) Constructive dividends.--If the taxpayer omits from gross income an amount properly includible therein under section 951(a), the tax may be assessed, or a proceeding in court for the collection of such tax may be done without assessing, at any time within 6 years after the return was filed.

## § 6662 Imposition of accuracy-related penalty on underpayments, (a)-(d)

(a) Imposition of penalty.--If this section applies to any portion of an underpayment of tax required to be shown on a return, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which this section applies.

(b) Portion of underpayment to which section applies.--This section shall apply to the portion of any underpayment which is attributable to 1 or more of the following:

(1) Negligence or disregard of rules or regulations.

(2) Any substantial understatement of income tax.

(3) Any substantial valuation misstatement under chapter 1.

(4) Any substantial overstatement of pension liabilities.

(5) Any substantial estate or gift tax valuation understatement.

(6) Any disallowance of claimed tax benefits by reason of a transaction lacking economic substance (within the meaning of section 7701(o)) or failing to meet the requirements of any similar rule of law.

(7) Any undisclosed foreign financial asset understatement.

(8) Any inconsistent estate basis.

(9) Any overstatement of the deduction provided in section 170(p).

(10) Any disallowance of a deduction by reason of section 170(h)(7).

This section shall not apply to any portion of an underpayment on which a penalty is imposed under section 6663. Except as provided in paragraph (1) or (2)(B) of section 6662A(e), this section shall not apply to the portion of any underpayment which is attributable to a reportable transaction understatement on which a penalty is imposed under section 6662A.

(c) Negligence.--For purposes of this section, the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term "disregard" includes any careless, reckless, or intentional disregard.

(d) Substantial understatement of income tax.--

(1) Substantial understatement.--

(A) In general.--For purposes of this section, there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of--

(i) 10 percent of the tax required to be shown on the return for the taxable year, or

(ii) $5,000.

(B) Special rule for corporations.--In the case of a corporation other than an S corporation or a personal holding company (as defined in section 542), there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the lesser of--

(i) 10 percent of the tax required to be shown on the return for the taxable year (or, if greater, $10,000), or

(ii) $10,000,000.

(C) Special rule for taxpayers claiming section 199A deduction.--In the case of any taxpayer who claims any deduction allowed under section 199A for the taxable year, subparagraph (A) shall be applied by substituting "5 percent" for "10 percent".

(2) Understatement.--

(A) In general.--For purposes of paragraph (1), the term "understatement" means the excess of--

(i) the amount of the tax required to be shown on the return for the taxable year, over

(ii) the amount of the tax imposed which is shown on the return, reduced by any rebate (within the meaning of section 6211(b)(2)).

The excess under the preceding sentence shall be determined without regard to items to which section 6662A applies.

(B) Reduction for understatement due to position of taxpayer or disclosed item.--The amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to--

(i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or

(ii) any item if--

15256057.1

(I) the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return, and

(II) there is a reasonable basis for the tax treatment of such item by the taxpayer.

For purposes of clause (ii)(II), in no event shall a corporation be treated as having a reasonable basis for its tax treatment of an item attributable to a multiple-party financing transaction if such treatment does not clearly reflect the income of the corporation.

(C) Reduction not to apply to tax shelters.--

(i) In general.--Subparagraph (B) shall not apply to any item attributable to a tax shelter.

(ii) Tax shelter.--For purposes of clause (i), the term "tax shelter" means--

(I) a partnership or other entity,

(II) any investment plan or arrangement, or

(III) any other plan or arrangement,

if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax.

(3) Secretarial list.--The Secretary may prescribe a list of positions which the Secretary believes do not meet 1 or more of the standards specified in paragraph (2)(B)(i), section 6664(d)(3), and section 6694(a)(1). Such list (and any revisions thereof) shall be published in the Federal Register or the Internal Revenue Bulletin.

## § 7609.  Special procedures for third-party summons, (f)

(f) Additional requirement in the case of a John Doe summons.--Any summons described in subsection (c)(1) which does not identify the person with respect to whose liability the summons is issued may be served only after a court proceeding in which the Secretary establishes that--

(1) the summons relates to the investigation of a particular person or ascertainable group or class of persons,

(2) there is a reasonable basis for believing that such person or group or class of persons may fail or may have failed to comply with any provision of any internal revenue law, and

(3) the information sought to be obtained from the examination of the records or testimony (and the identity of the person or persons with respect to whose liability the summons is issued) is not readily available from other sources.

The Secretary shall not issue any summons described in the preceding sentence unless the information sought to be obtained is narrowly tailored to information that pertains to the failure (or potential failure) of the person or group or class of persons referred to in paragraph (2) to comply with one or more provisions of the internal revenue law which have been identified for purposes of such paragraph.

15256057.1

## Treas. Reg. §1.6664-2, Underpayment, (c)

(c) Amount shown as the tax by the taxpayer on his return—
(1) Defined. For purposes of paragraph (a) of this section, the amount shown as the tax by the taxpayer on his return is the tax liability shown by the taxpayer on his return, determined without regard to the items listed in paragraphs (b)(1), (2), and (3) of this section, except that it is reduced by the excess of—

(i) The amounts shown by the taxpayer on his return as credits for tax withheld under section 31 (relating to tax withheld on wages) and section 33 (relating to tax withheld at source on nonresident aliens and foreign corporations), as payments of estimated tax, or as any other payments made by the taxpayer with respect to a taxable year before filing the return for such taxable year, over

(ii) The amounts actually withheld, actually paid as estimated tax, or actually paid with respect to a taxable year before the return is filed for such taxable year.

(2) Effect of qualified amended return. The amount shown as the tax by the taxpayer on his return includes an amount shown as additional tax on a qualified amended return (as defined in paragraph (c)(3) of this section), except that such amount is not included if it relates to a fraudulent position on the original return.

(3) Qualified amended return defined—(i) General rule. A qualified amended return is an amended return, or a timely request for an administrative adjustment under section 6227, filed after the due date of the return for the taxable year (determined with regard to extensions of time to file) and before the earliest of—

(A) The date the taxpayer is first contacted by the Internal Revenue Service (IRS) concerning any examination

15256057.1

(including a criminal investigation) with respect to the return;

(B) The date any person is first contacted by the IRS concerning an examination of that person under section 6700 (relating to the penalty for promoting abusive tax shelters) for an activity with respect to which the taxpayer claimed any tax benefit on the return directly or indirectly through the entity, plan or arrangement described in section 6700(a)(1)(A);

(C) In the case of a pass-through item (as defined in § 1.6662–4(f)(5)), the date the pass-through entity (as defined in § 1.6662–4(f)(5)) is first contacted by the IRS in connection with an examination of the return to which the pass-through item relates;

(D)(1) The date on which the IRS serves a summons described in section 7609(f) relating to the tax liability of a person, group, or class that includes the taxpayer (or pass-through entity of which the taxpayer is a partner, shareholder, beneficiary, or holder of a residual interest in a REMIC) with respect to an activity for which the taxpayer claimed any tax benefit on the return directly or indirectly.

(2) The rule in paragraph (c)(3)(i)(D)(1) of this section applies to any return on which the taxpayer claimed a direct or indirect tax benefit from the type of activity that is the subject of the summons, regardless of whether the summons seeks the production of information for the taxable period covered by such return; and

(E) The date on which the Commissioner announces by revenue ruling, revenue procedure, notice, or announcement, to be published in the Internal Revenue Bulletin (see § 601.601(d)(2) of this chapter), a settlement initiative to compromise or waive penalties, in whole or in part, with respect to a listed transaction. This rule applies only to a taxpayer who participated in the listed transaction and for the taxable year(s) in which the taxpayer

15256057.1

claimed any direct or indirect tax benefits from the listed transaction. The Commissioner may waive the requirements of this paragraph or identify a later date by which a taxpayer who participated in the listed transaction must file a qualified amended return in the published guidance announcing the listed transaction settlement initiative.

*      *      *      *      *

(5) Examples. The following examples illustrate the provisions of paragraphs (c)(3) and (c)(4) of this section:

*      *      *      *      *

Example 5. On November 30, 2003, the IRS served a John Doe summons described in section 7609(f) on Corporation Y, a credit card company. The summons requested the identity of, and information concerning, United States taxpayers who, during the taxable years 2001 and 2002, had signature authority over Corporation Y's credit cards issued by, through, or on behalf of certain offshore financial institutions. Corporation Y complied with the summons, and identified, among others, Taxpayer B. On May 31, 2004, before the IRS first contacted Taxpayer B concerning an examination of Taxpayer B's Federal income tax return for the taxable year 2002, Taxpayer B filed an amended return for that taxable year, that showed an increase in Taxpayer B's Federal income tax liability. Under paragraph (c)(3)(i)(D) of this section, the amended return is not a qualified amended return because it was not filed before the John Doe summons was served on Corporation Y.

Example 6. The facts are the same as in Example 5. Taxpayer B continued to maintain the offshore credit card account through 2003 and filed an original tax return for the 2003 taxable year claiming tax benefits attributable to the existence of the account. On March 21, 2005, Taxpayer B filed an amended return for the taxable year 2003, that showed an increase in Taxpayer B's Federal income tax liability. Under paragraph (c)(3)(i)(D) of this section, the amended return is not a qualified amended return

because it was not filed before the John Doe summons for 2001 and 2002 was served on Corporation Y, and the return reflects benefits from the type of activity that is the subject of the John Doe summons.

## Treas. Reg. § 301.7609-5, Suspension of periods of limitations

(a) In general. Except in the case of a summons that is a designated or related summons described in section 6503(j), the following rules relating to the suspension of certain periods of limitations apply to all third-party summonses subject to the notice requirements of section 7609(a) and to all John Doe summonses subject to the requirements of section 7609(f).

(b) Intervention in an action to enforce the summons—(1) In general. If a person entitled to notice of a summons under section 7609(a) and § 301.7609–2 with respect to whose liability the summons was issued, or such person's agent, nominee, or other person acting under the direction or control of the person entitled to notice, takes any action to intervene in a proceeding with respect to enforcement of such summons brought pursuant to section 7604, that person's periods of limitations under sections 6501 (relating to assessment and collection) and 6531 (relating to criminal prosecutions) for the tax period or periods that are the subject of the summons are suspended for the period during which such proceeding is pending.

(2) Action to intervene. A person entitled to notice takes any action to intervene in a proceeding to enforce a summons within the meaning of § 301.7609–4(a) on the date when a motion to intervene is filed with the court.

(c) Institution of a proceeding to quash a summons—(1) In general. If a person entitled to notice of a summons under section 7609(a) and § 301.7609–2 with respect to whose liability the summons was issued, or such person's agent,

nominee, or other person acting under the direction or control of such person, takes any action described in § 301.7609–4(b) to institute a proceeding to quash such summons, that person's periods of limitations under sections 6501 and 6531 for the tax period or periods that are the subject of the summons are suspended for the period during which such proceeding is pending.

(2) Action to institute a proceeding to quash a summons. A person entitled to notice takes any action to institute a proceeding to quash if he or she files a petition to quash the summons in any district court, regardless of whether the timely filing requirements of section 7609(b)(2)(A) or the notice requirements of section 7609(b)(2)(B) are satisfied. For example, a person entitled to notice takes an action to institute a proceeding to quash a summons for purposes of this section if that person files a petition to quash the summons in district court and notifies the summoned person by sending a copy of the petition by registered or certified mail, but fails to mail a copy of that notice to the appropriate Internal Revenue Service (IRS) person and office.

(d) Summoned party's failure to finally resolve the response to a summons after six months from service—(1) In general. If a third party's response to a summons for which the IRS was required to provide notice to persons identified in the summons, or to a John Doe summons described in section 7609(f), is not finally resolved within six months after the date of service of the summons, the periods of limitations are suspended under sections 6501 and 6531, for the person with respect to whose liability the summons was issued and for any person whose identity is sought to be obtained by a John Doe summons, for the tax period or periods that are the subject of the summons. The suspension shall begin on the date which is six months after the service of the summons and shall end on the date on which there is a final resolution of the summoned party's response to the summons.

(2) Example. The rules of paragraph (d)(1) of this section are illustrated by the following example:

A John Doe summons is issued on April 1, 2004, to the promoter of a tax shelter and seeks the names of all participants in the shelter in order to investigate the participants' income tax liabilities for 2001 and 2002. The district court approves service of the summons on April 30, 2004, and the summons is served on the promoter on May 3, 2004. The promoter does not provide the names of the participants. The periods of limitations for the participants' income tax liabilities and criminal prosecution for 2001 and 2002 are suspended under section 7609(e)(2) beginning on November 3, 2004, the date which is six months after the date the John Doe summons was served until the date on which the promoter's response to the summons is finally resolved.

(e) Definitions—(1) Agent, nominee, etc. A person is the agent, nominee, or other person of a person entitled to notice under section 7609(a) and § 301.7609–2, and is acting under the direction or control of the person entitled to notice for purposes of section 7609(e)(1), if the person entitled to notice has the ability in fact or at law to cause the agent, nominee or other person, to take the actions permitted under section 7609(b).

(2) Period during which a proceeding is pending—(i) Intervention in an enforcement proceeding. The period during which the periods of limitations under sections 6501 and 6531 are suspended under section 7609(e)(1) begins on the date any person described in paragraph (b) of this section intervenes in an action to enforce the summons. The periods of limitations remain suspended until all appeals are disposed of, or until the expiration of the period during which an appeal may be taken or a request for further review may be made. The periods of limitations remain suspended for the period during which a proceeding is pending, regardless of compliance (or partial compliance)

-86-

with the summons during that period. If, following issuance of an order to enforce a third-party summons, a collateral proceeding is brought challenging whether production made by the summoned party fully satisfied the court order and whether sanctions should be imposed against the summoned party for a failure to satisfy that order, the periods of limitations remain suspended until all appeals of the collateral proceeding are disposed of, or until the expiration of the period during which an appeal may be taken or a request for further review of the collateral proceeding may be made. Any collateral proceeding to the original proceeding shall be considered to be a continuation of the original proceeding.

(ii) Proceeding to quash a summons. The period during which the periods of limitations under sections 6501 and 6531 are suspended under section 7609(e)(1) begins on the date any person described in paragraph (c) of this section files a petition to quash the summons in district court. The periods of limitations remain suspended until all appeals are disposed of, or until expiration of the period in which an appeal may be taken or a request for further review may be made. The periods of limitations remain suspended for the period during which a proceeding is pending, regardless of compliance (or partial compliance) with the summons during that period.

(iii) Examples. The rules of paragraph (e)(2) are illustrated by the following examples:

Example 1. A revenue agent issues a summons to A, an accountant for B, requiring production of records relating to B's income tax liabilities for 2002. The summons is served on A on March 1, 2004. B files a petition to quash the summons in district court on March 15, 2004. The district court dismisses B's petition on July 1, 2004. B fails to appeal this decision by filing a notice of appeal within 60 days from the date of the district court's order of dismissal. The revenue agent notifies A that B did not appeal the district court's

order. A turns over all of the records requested in the summons. The periods of limitations applicable to B for 2002 under sections 6501 and 6531 are suspended under section 7609(e)(1) from March 15, 2004, the date B filed a petition to quash, until August 30, 2004, the last day on which B could have filed a notice of appeal.

Example 2. A revenue agent issues a summons to A, an accountant for B, requiring production of records relating to B's income tax liabilities for 2003. The summons is served on A on June 1, 2005. B files an untimely petition to quash the summons in district court on June 29, 2005. The district court dismisses B's petition on July 29, 2005. B does not file an appeal of the district court's order. The periods of limitations applicable to B for 2003 under sections 6501 and 6531 are suspended under section 7609(e)(1) from June 29, 2005, the date B filed an untimely petition to quash, until September 27, 2005, the last day on which B could have filed a notice of appeal.

(3) Final resolution of the summoned third party's response to a summons. For purposes of section 7609(e)(2)(B), final resolution with respect to a summoned party's response to a third-party summons occurs when the summons or any order enforcing any part of the summons is fully complied with and all appeals or requests for further review are disposed of, the period in which an appeal may be taken has expired or the period in which a request for further review may be made has expired. The determination of whether there has been full compliance will be made within a reasonable time, given the volume and complexity of the records produced, after the later of the giving of all testimony or the production of all records requested by the summons or required by any order enforcing any part of the summons. If, following an enforcement order, collateral proceedings are brought challenging whether the production made by the summoned party fully satisfied the court order and whether sanctions should be imposed against the summoned party for a failing

-88-

to do so, the suspension of the periods of limitations shall continue until the summons or any order enforcing any part of the summons is fully complied with and the decision in the collateral proceeding becomes final. A decision in a collateral proceeding becomes final when all appeals are disposed of, the period in which an appeal may be taken has expired or the period in which a request for further review may be made has expired.

(f) Effective/applicability date. This section is applicable on April 30, 2008.